STATE OF NORTH CAROLINA v. NORRIS AUSTIN

No. 297A86

(Filed 7 July 1987)

1. **Criminal Law §§ 73.3; 169.5— hearsay—state of mind of victim—no prejudicial error**

There was no prejudicial error in a murder prosecution from the admission of testimony that the victim had told State's witnesses that she was going to move out of the house she shared with defendant where, assuming arguendo that the evidence was erroneously admitted, there was substantial evidence from which defendant's guilt could be inferred and it could not be said that there was a reasonable possibility that, without the testimony, the resulting trial would have been different. N.C.G.S. § 15A-1443(a).

2. **Searches and Seizures § 15— search of house—standing to challenge**

The trial court in a murder prosecution erred by ruling that defendant lacked standing to object to the search of the house in which he lived with the victims on the ground that defendant was not married to the woman with whom he lived and to whom the house was rented. Defendant had a reasonable expectation of privacy in the premises sufficient to confer standing; however, because his consent to the search was valid, evidence seized in the house was admissible.

3. **Searches and Seizures § 14— search of house—consent voluntary**

The trial court's ruling in a murder prosecution that defendant's consent to a search of his premises was valid was upheld, even though the trial judge's

State v. Austin

reasoning for denying defendant's motion to suppress was invalid, where the totality of the circumstances indicated that defendant's consent was voluntary.

4. **Criminal Law § 102.6— reading from appellate opinion on amnesia—not preju-dicial error**

Although the trial court erred in a murder prosecution by allowing the District Attorney to read from a Supreme Court opinion a quotation regarding amnesia, the error was not prejudicial because the evidence of defendant's guilt was overwhelming. N.C.G.S. § 15A-1443(a).

5. **Homicide § 18.1— murder—premeditated and deliberated—rapid firing rifle—evidence sufficient**

The trial court did not err in a murder prosecution by instructing the jury on premeditation and deliberation where the three victims suffered multiple wounds from a .22 caliber semi-automatic rifle which can be fired as rapidly as the trigger is pulled and which is capable of firing up to fifteen rounds within seconds. Even though the rifle was capable of being fired rapidly, the trigger must have been consciously pulled for each shot and some amount of time for thought and deliberation must have elapsed between each pull of the trigger, however brief; moreover, three people in two different rooms were killed.

6. **Criminal Law § 6— insanity caused by intoxication—evidence insufficient**

The trial court in a murder prosecution did not err by instructing the jury that voluntary intoxication would not support a defense of insanity where there was no evidence tending to show that defendant was suffering from any chronic or permanent insanity in consequence of his excessive ingestion of alcohol.

APPEAL by defendant from judgments sentencing defendant to consecutive terms of life imprisonment for each of three convictions of murder in the first degree, said judgments imposed by *Ferrell, J.,* at the 13 January 1986 session of Superior Court, BURKE County. Heard in the Supreme Court 16 April 1987.

*Lacy H. Thornburg, Attorney General, by Charles M. Hensey, Special Deputy Attorney General, for the state.*

*Lawrence D. McMahon, Jr. and Sam J. Ervin, IV for defendant.*

MARTIN, Justice.

The state's evidence at trial tended to show the following: In April 1985 defendant and Mary Sue "Susie" Blankenship White were living together in a house on Jenkins Road in Burke County with Susie's two daughters, Sheila Renee, aged nineteen, who was mentally handicapped, and Christy, aged fourteen. They had lived

together as a family for about eight years. Defendant had received total disability from Social Security because of some serious injuries he had sustained in a car accident some ten years previously. He was also a chronic alcoholic. Although he had quit drinking for about eight months because of some medications he was taking, he had resumed drinking after he had been bitten by a dog about a week prior to the events in question.

On Friday night, 5 April 1985, Susie's mother, Elizabeth Blankenship Murphy, who lived in a trailer directly behind Susie's house, was visiting at her daughter's house. Defendant was in the bedroom and the door was shut, and Mrs. Murphy and Susie were in the living room. Susie said, "Momma, I have lost sleep, I can't take this much longer." She continued, "If I can make it until the 3rd of next month, I'm going to see if I can't get me one of those FHA homes." Susie went on to explain to her mother that she could not get any rest or sleep because of defendant's drinking. Susie made similar statements to her brother's wife, Carol Blankenship, while they were conversing at Susie's kitchen table the following day. This conversation was interrupted, however, when defendant entered the kitchen and sat down at the table. Susie quickly changed the subject. Defendant asked Carol if she were doing okay. When she said yes, he replied, "Well, that's good, because if you wasn't, I was going to shoot you." He laughed and they began talking about something else. Carol testified that he appeared to be "[a]bout half way" drunk, which was normal for him. She also said that "[h]e wasn't himself that day, he just acted like he had something on his mind." Testimony at trial established that defendant thereafter became increasingly more withdrawn, preoccupied, and morose.

Sometime between 12:30 and 1:00 p.m. on Easter Sunday, Jim and Carol Blankenship went over to Susie's house to use the telephone. They knocked several times on the door leading into the carport, but no one answered. Jim walked around to the master bedroom window, knocked loudly with his fist, and then rapped on it several times with his pocketknife. Through the window he could see the defendant lying on the bed. Defendant stirred and grunted and Jim saw his arm "flop over." Thinking that defendant was coming to let them in, Jim returned to the carport and talked to his wife and his mother, Mrs. Murphy, who had seen them out the window and had walked over. When de-

fendant still did not come to the door, Jim returned to the bedroom window and again knocked on it loudly with his knife. He heard defendant's voice call out, "Is that you, Jim?" Jim replied, "Yeah, I need to use the telephone. Would you get up and let me in? The drain has come out of Carol's side." Defendant responded, "Go away and leave me alone." Jim returned to the carport and told the women what defendant had said. Mrs. Murphy then went around to the bedroom window and called out for defendant and Susie. Getting no answer, she walked around to the children's bedroom window and called their names. Thinking that perhaps defendant and Susie were in bed and didn't want to be bothered, Jim and Carol went to use Carol's mother's phone to call the doctor, and Mrs. Murphy went home. At trial, Jim testified that he believed that defendant "was either asleep or drunk, one thing."

Sheila and Christy White had planned to have Easter dinner with their grandparents, Albert and Opal White, after church on that Easter Sunday at about 1:15 p.m. Albert and Opal got home from church and waited for their granddaughters to arrive. When the girls failed to show up, Opal called her former daughter-in-law's house to find out what had happened. When no one answered, Opal hung up, waited about five minutes, and at 2:10 p.m. dialed again. This time defendant answered. When Opal told him that the girls were supposed to be there for lunch and asked him where they were, defendant said, "They're in the bedroom, I'll tell them." Opal was going to ask to speak to Christy, but defendant hung up. Opal turned to her husband and said, "Norris is drunk." She then dialed back, but no one answered. Opal and Albert discussed what had just transpired, decided something was wrong, and decided to drive up to Susie's house. Albert peered into the porch window and a large picture window, saw nothing unusual, and got back in his car and drove around to Mrs. Murphy's trailer. Meanwhile, defendant had telephoned his brother at about 3:00 p.m. and said that he wanted to be taken to get some more beer. Bill and his wife, Reba, left their house and went to pick up defendant. When Mrs. Murphy, Albert, and Opal saw Bill and Reba drive up the driveway, Albert got back in his car and returned to Susie's house. By the time he arrived, defendant had come out to his brother's car. Reba Austin testified that defendant's clothing was "all in a mess," but that she wouldn't say

he was drunk, "[h]e looked like somebody who was just getting over a real bad hangover." Both she and her husband also testified that defendant had defecated in his clothing, which was also wet with urine. When Albert asked defendant where Susie and the children were, defendant responded that they had gone off with Jim. Albert got in his car and began backing out of the driveway. However, when he saw defendant get into Bill's car and drive off, he pulled back up and went into the house. He walked through the kitchen, turned, looked into the bathroom, and saw Sheila, still dressed in her nightclothes, slumped over the bathtub, her legs out of the tub and her head, shoulders, and arms in it. Thinking that she was washing her hair but then noticing that there was no water in the tub, Albert picked Sheila up and laid her flat on her back. The tub was full of blood and blood was on Sheila's face and clothes. After he had laid Sheila down, Albert looked into a bedroom and saw Susie, dressed in a nightgown, lying "flat on the floor on her face," between the two beds. A "whole pond of blood" was under her face, Albert testified, and he touched her and she was stiff. Albert then turned and saw Christy in one of the beds, lying on her right side. A pool of blood was under her body and she also was stiff. Albert left the house and returned to Mrs. Murphy's trailer. He told Mrs. Murphy and his wife, "Well, he's killed them all," and said, "[s]omebody call the law." They then went over to Susie's house to wait for the ambulance and the sheriff's department personnel. This time both Albert and Opal went in the house. Around 3:49 p.m., sheriff's department personnel arrived to clear and secure the crime scene, and Sergeant Max Quarles and Detective Robin Dale went into the house to check on the location of the bodies and to interview Mr. White.

Shortly thereafter, at about 4:00, Bill Austin returned with defendant. Defendant was put in Quarles' patrol car and transported to the Burke County Jail, where he gave his consent to search the residence. A .22 semiautomatic Remington Speedmaster rifle was found under the covers of the bed in the master bedroom. The safety was off. Numerous shell casings, several bullets, a full cartridge, and an unspent cartridge were found on the bedroom floor. The details of defendant's initial detention and arrest, the obtaining of his consent, and the search of the Jenkins Road house will be discussed later in this opinion on the issue of his motion to suppress.

Dr. Dorwyn Wayne Croom, Burke County Medical Examiner, examined the bodies of Susie, Sheila, and Christy White at the scene of the killings at 5:00 p.m. on 7 April. Upon visual examination, he observed gunshot wounds to the back, left buttock, right leg, and head of Christy, two gunshot wounds to the left side of Sheila, and four gunshot wounds to Susie's back. Dr. Croom also performed the autopsies on the bodies the following day. He determined that there were a total of nine gunshot wounds on the body of Christy. In Dr. Croom's opinion, the gunshot wounds to the head and back caused death. Autopsy of Sheila confirmed that she had suffered two gunshot wounds. Dr. Croom determined that Sheila White died as a result of a gunshot wound to the chest. Four gunshot wounds had been inflicted on the mid- and left side of the back of Susie White. Dr. Croom stated that death was caused by gunshot wounds to the back. In examining these wounds, Dr. Croom did not observe the presence of any gunpowder or stippling. All of the bullets recovered were turned over to the SBI at the time of autopsies as evidence. From other tests he performed on the bodies, he estimated the time of the victims' deaths to have been sometime between midnight and noon on Easter Sunday.

SBI fingerprint identification and comparison expert Johnny Leonard testified that three right palmprints, a right middle fingerprint, and a right thumbprint lifted from the .22-caliber rifle found in the bed matched the known inked impressions of defendant's corresponding fingerprints and palmprints. SBI agent Jim Evans, a firearms and toolmarks identification expert, testified that the casings and all of the bullets which were collected at the autopsy and at the scene of the killings had similar class characteristics with the exception of one which had no class characteristics that could be identified. He testified that bullets fired from the .22 rifle found in the bed would be expected to have these class characteristics and some of the same microscopic imperfections, but he was unable to gain sufficient information in order to give his opinion that no other gun could have fired those bullets.

The defendant offered several witnesses in his behalf at trial. Morganton pharmacist Dan Rhodes testified as to all the prescriptions which had been filled at his store for defendant from 13 November 1984 through 27 March 1985. Among these medications were Rufen (ibuprofen, an anti-inflammatory agent for arthritis

and minor aches and pains), Clindex (librax, for control of irritable bowel syndrome), Aldactone (spironolactone, a diuretic), Halcion .5 mg. (sleeping pills), Tessalon (cough suppressant), and Lasix (a diuretic). The Physician's Desk Reference, defendant's family doctor, Dr. James Croft, and Dr. Croom indicated that Halcion and Librax should not be taken in combination with alcohol, as together they would produce increased sedation, drowsiness, or lack of coordination. Dr. Croft testified that he treated defendant intermittently from 13 June 1983 until 27 March 1985 for cirrhosis of the liver and that he had prescribed all the medications introduced into evidence as defendant's exhibits. He said that defendant was by admission an alcoholic.

A. L. Hullett, chief jailer at the Burke County Sheriff's Department, testified that when he saw defendant at the jail at approximately 8:00 a.m. on 8 April 1985, defendant "looked as if he had a rough night. He was disheveled . . . he just looked like he may have been hung over." Although defendant was in a one-person cell, Hullett said, defendant "did ask me if I'd keep other people out of his cell, that they were walking through the cell." Defendant also reportedly hallucinated that people had come through his cell and threatened to rape his family; that jail personnel had "turned water in on him, had flooded him out"; and that he had seen animals. Consequently, on 16 April, defendant was sent by court order to Dorothea Dix Hospital for evaluation and medical attention.

Defendant testified in his own behalf at trial. He said, "I loved [Susie and the kids] to death, ain't nobody loved them as much as me. Ain't no way I could have done this." He said that he did not drink a drop of alcohol for eight months prior to 30 March 1985. However, on that day, while he and Christy were out jogging together, he was bitten by a dog. The emergency room experience made him nervous, he said, and he bought a twelve-pack of beer. He testified that he drank six or seven of the beers, that he remembered going into the workshop with the remaining beers, and that the next thing he remembered was that he was in jail and that warrants were being read to him. On cross-examination defendant denied remembering that he fell in the bathroom at home on Wednesday, 3 April, and injured his eye, or that Mrs. Murphy spent the night at the house on Wednesday, Thursday and Friday; denied any recollection of telling anyone

that he was in the house on the day of the killings and that he knew who did it but that it was not him; denied remembering that he pawned a tiller in Morganton on 4 April; denied any remembrance of a conversation he had with his brother on 7 April in which defendant several times offered his brother all his tools, his guns, and his car — basically everything defendant owned — and in which defendant said, "I won't be here tomorrow." He said that he recalled being in Dorothea Dix but did not recall going there and that he remembered attempting to escape when he returned from Dix and was being taken back into the jail. He also admitted that he was not forced against his will to resume drinking and that from fifteen years experience with alcohol, he knew what it did to him.

The state's rebuttal witness, Dr. Patricio Lara, an expert in forensic psychiatry practicing at Dix Hospital, testified that upon defendant's admission to Dix, he was placed on a detoxification routine with vitamins and tranquilizers. Dr. Lara said he had insufficient data about defendant's condition at the time of the offenses to enable him to form an opinion as to whether defendant was able to know right from wrong or understand the full nature and quality of his actions. He said that defendant's condition at the time of discharge was "clear with no evidence of psychosis." On cross-examination Dr. Lara admitted that it is possible that an alcoholic who has been on a seven-day binge could develop amnesia and could be rendered unable or lack the mental capacity to know what he was doing. Also on rebuttal Max Quarles testified as to the details of defendant's escape attempt.

[1] By his first assignments of error defendant challenges the admission of testimony by state's witnesses Carol Jeane (Blankenship) Danner and Elizabeth Murphy as to the statements made by Susie White to the effect that if she could make it to the third of the next month, she was going to get an FHA home and move out. Although defendant concedes that Susie's extrajudicial statements fall within the "state of mind" exception to the hearsay rule, N.C.R. Evid. 803(3), he points out that the state of mind exception may not be used to prove past facts or memories. Moreover, he says, although the state of mind of a defendant may be relevant as to the existence of premeditation and deliberation and specific intent to kill, the state of mind of a victim is not relevant except insofar as it may bear on the state of mind of the defend-

ant. Such testimony of the state of mind of the victim, used to show the state of mind of the defendant, is relevant only if it can be demonstrated that defendant knew the victim's state of mind. Here, the witnesses' testimony was irrelevant and inadmissible because there was no evidence that defendant ever heard such remarks, which were made in a hushed tone and which ended as soon as defendant entered the room. N.C.R. Evid. 402. He also argues that even though evidence tending to establish motive is relevant to a determination of premeditation and deliberation, *State v. Alston*, 307 N.C. 321, 298 S.E. 2d 631 (1983), the evidence complained of here was insufficient for that purpose, as there was no evidence that the victim's intention was ever communicated to the defendant. *State v. Vestal*, 278 N.C. 561, 596-97, 180 S.E. 2d 755, 778 (1971).

Assuming arguendo that it was error to admit the testimony of these witnesses, particularly that of Mrs. Danner, we do not find that such error was prejudicial. The evidence taken in the light most favorable to the state indicated that defendant, a chronic alcoholic, had been drinking steadily from 30 March until 7 April. He began exhibiting unusual behavior on about 4 April, on which day he told Elizabeth Murphy to plant a garden in a bucket of dirt and got "crazy drunk" and became angry with Christy. After Carol's visit on 6 April, defendant continued drinking, appeared to have something on his mind, and said very little. Defendant was seen outside his house between 10:30 and 11:00 p.m. that night, and he appeared to be drunk. Mrs. Murphy heard rifle shots coming from the direction of the house between 1:00 and 2:00 a.m. in the early morning of 7 April. Medical testimony established the time of the victims' deaths as between midnight and noon on Sunday, 7 April. The bedroom lights in Susie White's house were seen on at late hours, which was unusual, and also unusual was the fact that the light in the bathroom, in which Sheila's body was found, also burned all night. At noon, the curtains in the children's bedroom, in which the bodies of Susie and Christy White were found, were still closed, which also was out of the ordinary. After Bill Austin had taken defendant on the first beer run, defendant repeatedly told Bill he wanted him to have all his "stuff." Defendant declined to go in the house and get Susie so that Bill could ask her if this was okay with her. Defendant also refused to let Jim and Carol Blankenship come in the house to use

the telephone, even though Carol had just had surgery and a drain in her side had come out. Instead, he lay on the bed and told Jim to go away. When Opal White finally reached defendant on the telephone at about 2:10 p.m. and said that her grandchildren had failed to come for lunch, defendant stated that they were in the bedroom and that he would tell them. Defendant did not answer the phone when she called back. A .22-caliber Remington Speedmaster semiautomatic rifle was found in the bed which defendant and Susie had shared and in which defendant had been lying earlier in the day when Jim had gone to the window. Five of defendant's fingerprints were found on the weapon. The cartridges found in the house were determined to have been fired from this same rifle, and all of the bullets recovered from the bodies had the same class characteristics as the bullets test-fired by this gun. All of these facts taken together, particularly the fact that defendant remained in the house for numerous hours with three dead persons who had been killed with bullets fired from a gun found in the defendant's bed and on which defendant's fingerprints were found, is substantial evidence from which defendant's guilt can be inferred. Regardless of whether defendant overheard any of the conversation between Susie White and her mother or between Susie and her sister-in-law, we cannot say that there is a reasonable possibility that without this testimony the result at trial would have been different. N.C.G.S. § 15A-1443(a) (1977). Accordingly these assignments of error are overruled.

Defendant contends by his next assignments of error that the trial court erred in denying defendant's motion to suppress the evidence seized during the search of the Jenkins Road house on 7 April 1985. Following a suppression hearing, the trial court concluded that defendant had no standing to contest the search of the residence and the seizure of the evidence or, alternatively, that defendant was not so intoxicated that he was unable to give his consent to the search. Defendant argues that these conclusions of law were erroneous.

Testimony at trial established that defendant and Susie White were not married. Defendant, Susie, Sheila, and Christy had originally lived together in a trailer beginning in about 1979 or 1980. The Jenkins Road house into which they had later moved and in which they were living on 7 April 1985 was owned by one Champ Clark. Although for some months Reba Austin, who man-

aged the trailer park in which the house was located, had issued rent receipts to defendant and Susie White jointly, more recently it was Susie White who had rented the house.

The evidence at trial further showed that after the bodies had been discovered and officers had arrived on the scene, Bill and Reba Austin and defendant drove up the driveway of the Jenkins Road house. A crowd had gathered on the property and when the Austins' car arrived, a woman in the crowd shouted, "there's the s.o.b. that killed them." When Quarles heard the hostile statements from the crowd which had gathered, he decided to put defendant in his patrol car, in "[d]etention. Not under arrest." Quarles testified, "The reason he was removed from the scene to the Burke County Sheriff's Department is because of the crowd on the scene. Some of them were pretty disturbed over what had happened, and for his safety we removed him." Quarles approached the Austins' car, opened the rear door, and asked defendant to get out of the car. When defendant did not move, Quarles went to the other side of the car, opened the door, and took hold of defendant's right arm. Bill Austin commented that defendant had a bad leg or foot, and both Quarles and Bill helped defendant out. Quarles testified that at this time defendant "smelled like beer to me." Opal White testified that she saw defendant get out of Bill's car and walk and that "[h]e appeared all right." The deputy then asked defendant to get in the backseat of the patrol car. Defendant replied that he was not going unless he could take his beer. Quarles said "all right, bring your beer and come on," and defendant got in the backseat of Quarles' squad car. The rear door of the squad car was designed to lock automatically when closed. About twenty minutes later, after Quarles had helped clear the area, defendant was taken to the Burke County Sheriff's office. Quarles read defendant his rights when they arrived at the jail at around 4:30. Quarles asked defendant if he understood what had just been explained to him, and defendant stated that he did. He also said that he did not think he needed a lawyer. When asked what he noticed about the way the defendant was walking, Burke County magistrate Frank Canon replied, "He just walked slowly." Quarles testified that defendant was neither staggering nor stumbling as he walked. Defendant was taken into the automatically-locked lobby of the jail where he was given a seat and asked to wait until the detectives got in to talk to him.

About forty-five minutes later Quarles got a phone call from the chief detective, Captain Whisnant, who requested that he ask the defendant for his consent to search the residence for a murder weapon. Up to that time, only a walk-through and visual sweep of the house had been made. Quarles then asked the two jailers on duty, neither of whom was wearing a gun, and the magistrate to witness the conversation he was about to have with the defendant. Quarles testified that he "explained very carefully to the defendant what we were—what the situation was, that three bodies had been found in his residence, apparently shot, and our detectives were on the scene, and would like permission to search the residence for a murder weapon. And I explained to him that it was strictly up to him, it would be voluntary, if he didn't want to grant permission, that was his privilege." Defendant then replied, "okay, go ahead." Canon's testimony substantially corroborated the testimony of Quarles. He recalled that Quarles told defendant what had been found, that Quarles asked defendant if he remembered the rights read to him earlier, that defendant responded that he did and that defendant said, "yes, go ahead and search the house, I didn't kill nobody, but I know who did." When asked what he noticed or observed when Quarles was asking questions of defendant, Canon responded, "He answered the questions. Didn't have no trouble." Quarles also testified that no promises or threats were made to get defendant to give his consent to search, and when asked if any type of coercion of the defendant was used, Quarles responded, "No sir. In fact, I was very polite." Quarles then relayed the consent to Detective Whisnant. He also said that defendant had not been told he was under arrest.

After having been advised that defendant's consent to search the Jenkins Road house had been obtained, Burke County officers waited for SBI agent Robert Melton to arrive on the scene at about 5:20 p.m. Accompanied by Detective Robin Dale, Melton then conducted a search of the house. Towards the end of the search, while Melton was in the hall foyer, Dale went into the master bedroom and was looking at shell casings which were visible on the floor. Dale placed his hand on the bed to steady himself and got down on his knees to survey the floor, and touched something in the bed which felt to him like a rifle. Dale asked Melton to come into the bedroom. Melton pulled back the covers and found a .22-caliber Remington semiautomatic rifle underneath the

covers. The rifle was photographed and seized as evidence. Melton also seized some .22-caliber cartridge casings which were in plain view, several bullets, and some items of clothing. Bullet fragments were seized from the mattresses in Christy and Sheila's bedroom. Melton also observed powder burns and holes in a mattress.

Following the voir dire hearing on defendant's motion to suppress the rifle, the court concluded that "the seizure of the weapon, the Remington .22 automatic, was not the fruit of an impermissible intrusion into a constitutionally protected place with respect to Norris Austin," and denied defendant's motion to suppress. We find no error in the trial court's ruling.

[2] Defendant first argues that the trial court's findings of fact and conclusions of law with respect to the standing issue erroneously focus on defendant's apparent lack of financial contribution to the rental of the residence, evidently holding that one may not have a legitimate expectation of privacy in premises which one has not himself rented and on which one "is living in a manner not acceptable to conventional morality."

In its findings of fact as to the issue of standing, among other things the court found that

11. Mr. Austin and Mrs. White were not married although Mr. Austin had lived at the White premises for some five or six years. . . . With respect to the premises, Mrs. Billy Austin was responsible for the renting of the property where Mary Sue White and the defendant Austin lived. And her testimony was that it was Mary Sue White who rented the property. And the Court is not aware of any work of [sic] any gainful employment that the defendant Austin engaged in after his disability payments ceased.

From this the court concluded that there had been no showing that defendant had any standing to contest the search of the residence. The court said:

And the status of this defendant as the common-law, at most, companion of Mrs. White as having standing to assert the Fourth Amendment privilege is inconsistent with the law of North Carolina which gives priority to the rights of a tenant in possession. Moreover, particularly in North Carolina,

where no lawful status is given to such an extramarital relationship. The defendant in this case was in the area of a friend to Mrs. White, and friends seldom have standing to object to a search of premises not their own. Furthermore, the defendant had demonstrated to this Court no expectancy of privacy in the home of somebody and her two daughters other than a tenancy at will. The will being the one who rented the house.

The trial court ruled that defendant had no standing to assert the fourth amendment claim. However, in so doing, the trial court apparently overlooked or considered insignificant the testimony that joint rent receipts had in the past been issued to defendant and Susie and that defendant had resided there for five or six years, keeping all of his clothes there, eating and sleeping there, working in the yard, planting a garden, and receiving his mail there. Several witnesses testified that defendant, Susie, and the girls lived there as a family. We hold from our review of the totality of all the circumstances that defendant had a reasonable expectation of privacy in the premises sufficient to confer standing upon him. *Rakas v. Illinois*, 439 U.S. 128, 58 L.Ed. 2d 387 (1978). The fact that defendant and Susie were not married is not fatal to his standing to urge the fourth amendment claim. Accordingly, the trial court's ruling to the contrary was error.

[3] We turn now to the alternative basis for the trial court's decision with respect to the motion to suppress and to defendant's claim that the trial judge applied an incorrect legal standard in making his conclusions of law as to the issue of consent. After making its findings of fact on this matter, the trial court concluded as a matter of law the following:

14. Notwithstanding the insufficiency of the proof required from the defendant with respect to standing, the Court has considered whether or not there was consent, for where a person consents to a search the consent dispenses with the necessity for a searchwarrant [sic].

15. The presentation of evidence of intoxication standing alone is not sufficient to invalidate consent, unless the intoxication amounts to a mania as to lead the user to be unconscious of the meaning of his words. Nothing in this record supports the conclusion that this defendant was in a state of

mania or was unconscious to the meaning of his words. To the contrary, the evidence discloses the opposite.

Defendant contends that this "mania standard" for determining the voluntariness of an intoxicated defendant's consent, *State v. Logner*, 266 N.C. 238, 145 S.E. 2d 867 (1966), is not the proper standard because the appellate courts of this state have not applied this test when intoxication is the only factor possibly affecting voluntariness. *See State v. Baker*, 312 N.C. 34, 320 S.E. 2d 670 (1984) (intoxication and physical threats); *State v. Moore*, 64 N.C. App. 686, 308 S.E. 2d 358 (1983) (intoxication by drugs and lack of sleep). Moreover, defendant challenges the voluntariness of his consent on two grounds: his alleged intoxication; and his low intelligence, which has been held relevant to a determination of voluntariness, *State v. Fincher*, 309 N.C. 1, 305 S.E. 2d 685 (1983). He insists that as the trial court's single conclusion of law as to consent encompassed only the issue of intoxication as the sole factor affecting voluntariness, an improper legal standard was applied.

Assuming arguendo that the trial court's reasoning for denying defendant's motion to suppress was incorrect, we are not required on this basis alone to determine that the ruling was erroneous. *State v. Gardner*, 316 N.C. 605, 342 S.E. 2d 872 (1986). A correct decision of a lower court will not be disturbed on review simply because an insufficient or superfluous reason is assigned. The question for review is whether the ruling of the trial court was correct and not whether the reason given therefor is sound or tenable. *State v. Blackwell*, 246 N.C. 642, 644, 99 S.E. 2d 867, 869 (1957). The crucial inquiry for this Court is admissibility and whether the ultimate ruling was supported by the evidence.

The evidence at the voir dire hearing on defendant's motion to suppress indicates that defendant needed assistance in getting out of his brother's car and into Quarles' squad car. However, both Quarles and defendant's brother testified that this was because defendant had a bad leg, not because defendant was too intoxicated to walk. Opal White testified that he walked normally. Quarles did not affirmatively lock defendant inside the sheriff's car; rather, the door was designed so that it locked automatically when closed. Moreover, Quarles testified that this action was for the protection of the defendant from the hostile crowd and that defendant was in detention, not under arrest. Defendant asked for

and was allowed to take a can of beer into the car. When defendant arrived at the jail, he said that he understood his constitutional rights which were read to him from a printed card. He neither staggered nor stumbled as he walked into the jail. Neither of the jailers was wearing a gun. Upon receiving the call from officer Whisnant, Quarles said that he explained to defendant in detail that three bodies had been found in the house and that officers at the scene were requesting permission to search the house. Both Quarles and Canon agreed that defendant thereupon said for them to "go ahead." Defendant was not subjected to prolonged questioning, nor is there any indication that he was threatened or offered any promises or inducements in exchange for his consent to search. Dr. Lara, forensic psychiatrist at Dorothea Dix, testified that testing and assessment of defendant "revealed no symptoms or behavior . . . suggestive of a chronic brain damage," and no evidence of organic impairment. Defendant was determined to be in the borderline range of mental ability, with an IQ of 77. There was no history of skull fracture and "no documentation of any period of meaningful unconsciousness." Included in the doctor's report to the court was the statement that at 3:00 p.m. on 7 April 1985 when defendant returned home, he "was described to have appeared intoxicated but to have been fairly clear at the time he was interviewed a few hours later." The doctor further explained that "[c]onditions related to alcohol influence may change remarkably within a span of three or four hours." There is no evidence that his "low intelligence" affected the voluntariness of defendant's consent. He stated several times that he understood his rights that were explained to him and that he remembered them.

From the totality of the circumstances we hold that defendant's consent was voluntary. *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L.Ed. 2d 854 (1973). Defendant, advised of his rights, knowingly, freely, and voluntarily waived them. *State v. Fincher*, 309 N.C. 1, 305 S.E. 2d 685. Therefore, defendant's consent to the search of the premises was valid, and there was no error in the trial court's ruling on defendant's motion to suppress the seized evidence.

[4] Defendant next complains that the trial court committed prejudicial error in permitting the prosecutor to read a passage pertaining to amnesia from an opinion of this Court, *State v. Cad-*

*dell*, 287 N.C. 266, 215 S.E. 2d 348 (1975). In his closing argument, the prosecutor, over defendant's objection, was allowed to read the following excerpt:

> "Amnesia, loss of memory, may lead to crimes entirely unknown to the culprit at a later date. That is rare. More frequently, the accused, remembering full well what he has done, alleges amnesia in false defense. He is a malingerer. To prove his innocence or guilt may be most difficult. . . . Failure to remember later, when accused, is in itself no proof of the mental condition when crime was performed."

287 N.C. at 286, 215 S.E. 2d at 361 (quoting R. Gray, *Attorneys' Textbook of Medicine* § 96.01 (3d ed. 1949)). Although defendant acknowledges that this Court in *State v. Noland*, 312 N.C. 1, 302 S.E. 2d 642 (1984), found that the prosecutor's paraphrasing of this very same passage from *Caddell* to the jury did not amount to an impropriety so extreme as to require the trial judge to intervene ex mero motu, he argues that his theory of inadmissibility is sufficiently different from that propounded in *Noland* to warrant consideration. Whereas defense counsel in *Noland* argued that the reading of the passage was irrelevant, defendant argues that the reading here amounted to a violation of the rule prohibiting counsel from traveling outside the record in his argument to the jury. *E.g., State v. Locklear*, 294 N.C. 210, 241 S.E. 2d 65 (1978); *State v. Covington*, 290 N.C. 313, 226 S.E. 2d 629 (1976). Unlike *Noland*, here the passage was read over defendant's objection. We hold here that allowing the reading of this passage to the jury was erroneous, but we further hold that the error was not prejudicial to defendant.

As the Court noted in *State v. Gardner*, 316 N.C. 605, 342 S.E. 2d 872, "simply because a statement is made in a reported decision does not always give counsel the right to read it to the jury in his closing argument under N.C.G.S. § 84-14." 316 N.C. at 611, 342 S.E. 2d at 876. Because declarations or opinions of experts in a publication are not under oath and cannot be classified as evidence, and because reading of material, such as decisions of this Court, may tend to prejudice a party upon the facts, this Court has placed limitations upon the reading of reported decisions and other books and printed matter to the jury in closing argument. *See, e.g., Gardner; State v. McMorris*, 290 N.C. 286, 225

S.E. 2d 553 (1976); *Wilcox v. Motors Co.*, 269 N.C. 473, 153 S.E. 2d 76 (1967); *Conn v. R.R.*, 201 N.C. 157, 159 S.E. 331 (1931). It has been held permissible, for example, for counsel to read an excerpt from the reported decisions of an appellate court, *Brown v. Vestal*, 231 N.C. 56, 55 S.E. 2d 797 (1949), including the facts necessary to explain the legal principle under discussion, *Wilcox v. Motors Co.*, 269 N.C. 473, 153 S.E. 2d 76; *Cashwell v. Bottling Works*, 174 N.C. 324, 93 S.E. 901 (1917). However, although counsel may properly read statements of law and their attendant facts found in the original opinion to the jury, counsel may not read matters which are not law but rather constitute mere dicta and therefore are not within the scope of N.C.G.S. § 84-14, *Gardner*, 316 N.C. 605, 611, 342 S.E. 2d 872, 876, nor may counsel "read to the jury decisions discussing principles of law which are irrelevant to the case and have no application to the facts in evidence." *State v. Crisp*, 244 N.C. 407, 412-13, 94 S.E. 2d 401, 406 (1956).

It is true that *Noland* speaks only to the relevancy of the passage and does not decide the issue of traveling outside the record, while *Gardner* emphasizes the impropriety of allowing counsel to circumvent the rules by quoting secondary material from an appellate reporter rather than from the original source. In other words, *Gardner* condemns the practice of permitting a party to do by indirection what he could not do directly, which is precisely what occurred in the instant case. Thus, the quoting of the passage from *Caddell* was improper and the trial court's failure to sustain defendant's objection to the reading was error. However, defendant has failed to show that he was prejudiced. Dr. Croft testified that it was possible for a person who took Halcion while drinking alcohol heavily to develop an antigrade amnesia, or amnesia from a certain point on, but that it was "not very probable." However, there is no evidence that defendant consumed any Halcion tablets prior to the murders, although a prescription for one hundred tablets was filled for defendant on 27 March 1985. Dr. Croft also testified that a person who drank alcohol incessantly for several days could or might by the ingestion of that amount of alcohol alone develop antigrade amnesia "to a degree." However, on cross-examination, he testified that although amnesia might cause people not to remember something after it took place, that does not mean they were not aware of what they were doing while they were doing it. Dr. Lara testified

only that it was possible that an alcoholic who had been on a seven-day drinking binge could develop amnesia. He also said that he detected no evidence of chronic brain damage or organic impairment and that there was "no documentation of any period of meaningful unconsciousness." The testimony from both of these medical experts was merely generalized testimony concerning the possibility of amnesia developing from alcohol use or alcohol and drug use. Neither Dr. Croft nor Dr. Lara offered any opinion as to whether defendant himself did or could have suffered from any amnesia. Indeed, Dr. Lara testified that "to verify [a patient's] accurate recall and how much of their so-called amnesia is true or false, it would not be possible to verify beyond doubt on a retrospective basis when we're seeing the patient some time after the incident." Nor did Dr. Lara have sufficient data on which to base an opinion as to whether defendant knew right from wrong or was able to understand the nature or quality of his actions at the time of the killings. Defendant's self-serving testimony was that he could not remember anything from 30 March until sometime after he was arrested and in jail. The question of defendant's credibility with respect to the amnesia claim, then, was a matter for the jury to determine. Moreover, as discussed earlier in this opinion, the evidence of defendant's guilt presented by the state was convincing. In view of such overwhelming evidence, we hold that there is no reasonable possibility that the trial court's ruling affected the verdicts returned by the jury. N.C.G.S. § 15A-1443(a).

[5]  Next, defendant argues that the trial court committed prejudicial error in its instructions on premeditation and deliberation. The trial court instructed the jury as follows:

> Neither premeditation or deliberation are usually susceptible of direct proof. They may be proved from circumstances from which they may be inferred such as the conduct of the defendant before, during and after the killing; the use of grossly excessive force; the infliction of lethal wounds after the victim is felled; brutal or vicious circumstances of the killing; the manner in which or the means by which the killing was done.

These same instructions were later repeated upon a request by the jury. Although defendant concedes that the instructions are

in general a correct statement of the law, *State v. Gladden*, 315 N.C. 398, 340 S.E. 2d 673 (1986), he argues that they are inapplicable to the instant case, and an instruction which does not arise from some reasonable view of the evidence presented is erroneous. *State v. Buchanan*, 287 N.C. 408, 215 S.E. 2d 80 (1975). The evidence indicates that the three victims suffered multiple wounds which were inflicted from a .22-caliber semiautomatic rifle which can be fired as quickly as the trigger is pulled and is capable of firing up to fifteen rounds within seconds. The crux of defendant's argument seems to be that the ability to fire so rapidly negates the inference of premeditation based solely upon the number of wounds; he contends that the evidence does not support the inference that the victims had already been felled before the lethal wounds were inflicted and that the sheer number of wounds is not determinative of the issue of premeditation and deliberation. We do not agree with defendant's contention.

The evidence indicated that in order to fire the weapon with which the victims were killed, the trigger must be consciously pulled for each shot. Even though the rifle is capable of being fired rapidly, some amount of time, however brief, for thought and deliberation must elapse between each pull of the trigger. There is no evidence as to how much time passed between the shots. The fact that there was no evidence adduced at trial concerning either the sequence of the shootings or the sequence of the wounds is not relevant to a determination of this issue; the premise of the "felled victim" theory of premeditation and deliberation is that when numerous wounds are inflicted, the defendant has the opportunity to premeditate and deliberate from one shot to the next. Moreover, not just one but three persons in two different rooms were killed by this defendant. Susie White was shot four times in the middle and left side of her back; Sheila was shot twice in the left side; and Christy was shot nine times, sustaining entrance wounds to the head, left shoulder, back, left buttock, and leg. We have repeatedly held that the nature and number of the victims' wounds are circumstances from which premeditation and deliberation can be inferred. *State v. Bullard*, 312 N.C. 129, 322 S.E. 2d 370 (1984); *State v. Brown*, 306 N.C. 151, 293 S.E. 2d 569, *cert. denied*, 459 U.S. 1080, 74 L.Ed. 2d 642 (1982). We find that the evidence as to premeditation and deliberation was sufficient, and we hold that there was no error in the trial court's instructions.

[6] Last, the defendant claims that the trial court committed prejudicial error in its instructions on insanity. He claims that the instruction that voluntary intoxication would not support a defense of insanity was erroneous. Defendant contends that insanity resulting from long-term consumption of alcohol is a defense and relies upon *State v. Potts*, 100 N.C. 457, 6 S.E. 657 (1888). In the case sub judice, the trial court instructed as follows:

> Voluntary intoxication or a voluntary drugged condition, or both combined, cannot under the law of itself support a defense of insanity. That is to say, that if the defendant's defect of reason so as to be incapable of knowing the nature and quality of his acts, if any, or capability of distinguishing between right and wrong in relation to his act, if any, was produced or resulted solely from his voluntary ingestion of alcohol or drugs, or both, then he would not be eligible to rely upon the defense of insanity.

> However, this does not mean that a person voluntarily intoxicated by alcohol or drugs, or both, could not employ the defense of insanity. For though intoxicated, if by reason of some disease or deficiency of the mind not produced by the voluntary ingestion of alcohol or drugs, or both, he otherwise has satisfied you of the elements of insanity about which I have instructed you, then he would be eligible to rely upon the defense of insanity.

Defendant argues that there was sufficient evidence in the record to justify the submission of an insanity issue and that defendant was a long-term alcoholic, and thus "it was certainly within the realm of reasonable possibility that the jury could have concluded that Mr. Austin was insane and that his insanity resulted from long-continued abuse of alcohol."

Potts contains the obiter dictum that the law recognized chronic insanity and when produced by alcohol it assumes a permanent form. The statement has not been subsequently cited by this Court. Defendant's reliance upon this statement in *Potts* is misguided. Moreover, here there is no evidence that defendant is insane by whatever cause or reason.

It is well settled that voluntary intoxication is not a legal excuse for crime. *State v. Bunn*, 283 N.C. 444, 196 S.E. 2d 777 (1973);

*State v. Propst*, 274 N.C. 62, 161 S.E. 2d 560 (1968). As in *Bunn*, in the instant case the record is devoid of evidence that defendant, if he was intoxicated at the time of the killings, was involuntarily drunk or that he had become chronically or permanently insane as a result of his excessive use of alcohol. Defendant had abstained from drinking for about eight months prior to the murders; he had resumed drinking only about a week before the killings. Defendant had an IQ of 77 and had no organic brain damage. The only evidence tending to show that defendant experienced hallucinations, delusions, or delirium tremens was the testimony relating to his actions and statements several days after the killings while he was incarcerated in the Burke County Jail. In short, there was no evidence tending to show that defendant was suffering any chronic or permanent insanity in consequence of his excessive ingestion of alcohol. The trial court is required to instruct only upon matters arising upon the evidence at trial. *State v. Medley*, 295 N.C. 75, 243 S.E. 2d 374 (1978); *State v. Williams*, 280 N.C. 132, 184 S.E. 2d 875 (1971); *State v. Barker*, 270 N.C. 222, 154 S.E. 2d 104 (1967); *State v. Duncan*, 264 N.C. 123, 141 S.E. 2d 23 (1965). Accordingly, there was no error in the trial court's instructions. This assignment of error is overruled.

We hold that defendant received a fair trial, free from prejudicial error.

No error.