IN THE SUPREME COURT OF NORTH CAROLINA

No. 377PA22

Filed 17 October 2025

STATE OF NORTH CAROLINA

v.

MARTY DOUGLAS ROGERS

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous, unpublished decision of the Court of Appeals, No. COA21-707 (N.C. Ct. App. Dec. 6, 2022) reversing an order denying a motion to suppress entered on 26 February 2021 by Judge Phyllis M. Gorham in Superior Court, New Hanover County, and ordering that defendant is entitled to a new trial. Heard in the Supreme Court on 22 April 2025.

*Jeff Jackson, Attorney General, by Caden William Hayes, Assistant Attorney General, for the State-appellant.*

*Glenn Gerding, Appellate Defender, by Sterling Rozear, Assistant Appellate Defender, for defendant-appellee.*

NEWBY, Chief Justice.

In this case we address the good faith exception to the exclusionary rule. We do so in the context of determining whether the statutory good faith exception contained in N.C.G.S. § 15A-974 applies when a police officer obtains cell-site location information (CSLI) pursuant to an order (the Section 2703(d) Order) that the Court of Appeals later determined was not supported by probable cause as required by the

Constitutions of the United States and North Carolina. Section 15A-974 requires the exclusion of evidence in two situations: (1) when the evidence's "exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina"; or (2) when law enforcement obtained the evidence in "substantial violation of" Chapter 15A's provisions. We conclude that the statutory good faith exception under section 15A-974 does not apply here because, as written, such exception only applies when evidence is obtained in substantial violation of Chapter 15A's provisions, not when evidence is obtained in violation of the Constitutions of the United States or North Carolina. Nevertheless, because our ultimate task in this case is to determine whether the trial court properly denied defendant's motion to suppress, we also consider whether the Constitutions of the United States or North Carolina require the exclusion of the disputed CSLI. We conclude that they do not and therefore hold that the trial court properly denied defendant's motion to suppress. Accordingly, we reverse the Court of Appeals' decision reversing the trial court's order and ordering that defendant be granted a new trial.

## I.  Background & Procedural History

In July 2019, a known confidential source informed Detective Donald Wenk of the New Hanover County Sheriff's Office that defendant was trafficking and distributing large quantities of cocaine in New Hanover County. In light of this information, Detective Wenk applied to the trial court for a sealed "order authorizing [(1)] installation and monitoring of a pen register and/or trap and trace device, [(2)]

GPS and geo-location pursuant to N.C.G.S. §§ 15A-260[ to ]-264, and [(3)] . . . the production of records and other information pursuant to 18 U.S.C. § 2703(d)."[1] (Capitalization modified.) Detective Wenk specifically sought records for a cell phone reportedly used by defendant. In support of this application, Detective Wenk detailed the following information he had received from the confidential source:

> During the month of July 2019, Detective D. Wenk received information from a [c]onfidential [s]ource that . . . [defendant] is responsible for Trafficking/Distributing large quantities of [c]ocaine in New Hanover County. The [c]onfidential [s]ource[,] herein referred to as CS, stated that he/she has been to [defendant's] residence on multiple occasion[s] and has seen large quantities of [c]ocaine and has had numerous conversations inquiring about purchasing [c]ocaine. The CS further explained that [defendant] would make trips to Hayward, California[,] to purchase and transport trafficking amounts of [c]ocaine back to Wilmington, [North Carolina,] on multiple occasions. Det. Wenk, utilizing a law enforcement data base [sic], retrieved a photograph of [defendant]. Det. Wenk showed the CS the photograph of [defendant]. The CS identified the photograph of [defendant] as the individual who he/she knew to possess, transport, and make trips to Hayward, California[,] for trafficking in [c]ocaine. Within the last [seventy-two] hours Det. Wenk received further information from the CS who stated [defendant] was about to make another trip to Hayward,

---

[1] Subsection 2703(d) allows "court[s] of competent jurisdiction" to grant an "order for disclosure under subsection (b) [(Contents of wire or electronic communications in a remote computing service)] or (c) [(Records concerning electronic communication service or remote computing service)] . . . if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). The Supreme Court of the United States deems the capture of cell phone location records to be a search under the Fourth Amendment and therefore requires law enforcement to have probable cause to capture the data. *Carpenter v. United States*, 138 S. Ct. 2206, 2217, 2220–21 (2018).

California[,] to purchase a trafficking amount of [c]ocaine and transport it back to Wilmington[,] [North Carolina]. The CS provided a phone number . . . for [defendant]. The CS stated that this telephone number is the number that he/she has always contacted [defendant] on. Det. Wenk researched the phone number utilizing a law enforcement database provided by the CS. The phone number listed for [defendant] is the same number provided by the CS.

(Emphasis omitted.)

On 2 August 2019, the trial court determined there was probable cause to believe that defendant was trafficking cocaine and that defendant was using the identified cell phone. The trial court also decided there was " 'probable cause' to believe that 'historical records or other historical information' . . . related to the target telephone[ ] . . . [was] 'relevant and material' and w[ould] be of 'material aid' to th[e] ongoing criminal investigation." The trial court therefore approved Detective Wenk's application, thereby allowing law enforcement to, among other things, access defendant's CSLI "without geographical limits for the period of time ranging from [thirty] days prior to the date this order is signed and expiring [thirty] days from such date."

Defendant's cell phone carrier provided defendant's CSLI, which updated approximately every fifteen minutes, to law enforcement. Detective Wenk noticed that on 17 August 2019 at approximately 5:00 a.m., defendant's cell phone left Wilmington then headed west across the country. The cell phone arrived in Hayward, California, at 9:30 p.m. on 20 August 2019, where it stayed for approximately twenty to thirty minutes, and then began its trip back to Wilmington.

An officer spotted defendant's vehicle as it crossed North Carolina's southern border on Interstate 95 and began to follow it back to Wilmington. Officers subsequently stopped defendant's vehicle on the Cape Fear Memorial Bridge in New Hanover County and searched its interior. Inside, the officers discovered trafficking amounts of cocaine. A grand jury later indicted defendant for trafficking in cocaine by possession, trafficking in cocaine by transportation, possession with the intent to sell or deliver a Schedule II controlled substance, and maintaining a vehicle for keeping and selling controlled substances.

Pursuant to Article 53 of Chapter 15A, N.C.G.S. §§ 15A-971 to -980 (2019) ("Motion to Suppress Evidence"), defendant moved to suppress "all evidence including but not limited to any information resulting from an unlawful GPS [t]racking of [his] cell phone, any data from pen registers," and any other evidence seized in two additional searches. The trial court orally denied the motion, determining that reasonable suspicion supported the Section 2703(d) Order and the stop of defendant's vehicle. Defendant entered an *Alford* plea to trafficking in cocaine and possession with the intent to sell or deliver cocaine but appealed the denial of his suppression motion.[2]

The Court of Appeals awarded defendant a new trial. *State v. Rogers*, No.

---

[2] "An *Alford* plea is a type of guilty plea recognized by North Carolina's General Court of Justice in which a criminal defendant accepts that the State has sufficient evidence to convict him, but the defendant does not actually admit his guilt." *State v. Taylor*, 374 N.C. 710, 719 n.3, 843 S.E.2d 46, 52 n.3 (2020).

21-707, slip op. at 25–26 (N.C. Ct. App. Dec. 6, 2022) (unpublished). The court determined that Detective Wenk's "application was not supported by probable cause, as required by the Fourth Amendment, and the trial court issued its [Section] 2703(d) Order permitting law enforcement officers to obtain [d]efendant's historical CSLI data in violation of his constitutional rights." *Id.* at 22 (first citing *Carpenter*, 138 S. Ct. at 2221, and then citing *State v. Gore*, 272 N.C. App. 98, 104, 846 S.E.2d 295, 299 (2020)).

Before granting defendant a new trial, the Court of Appeals considered the State's argument that the so-called "good faith exception" to the exclusionary rule exempted the CSLI data from suppression. *Id.* Relying on *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988), where this Court stated, without explanation, that Article I, Section 20 of our state constitution contains an exclusionary rule with no good faith exception, the Court of Appeals stated that it was "bound . . . to disagree" with the State. *Rogers*, slip op. at 22. But the court observed in closing that "this case could present an additional opportunity for our Supreme Court to formally adopt the legislature's proposed good[ ]faith exception to the exclusionary rule under the North Carolina Constitution and expressly overrule *Carter*." *Id.* at 24–25.

The State petitioned this Court for discretionary review, pointing this Court to Session Law 2011-6, which is codified at section 15A-974, where the General Assembly adopted a good faith exception and specifically requested that this Court reconsider and overrule *Carter*. Thus, the State asserted that "this Court should take

this issue up for review and formally overrule *Carter*." (Underlining omitted; italics added.) By special order, this Court allowed review to consider "whether the good faith exception under N.C.G.S. § 15A-974 applies."

## II.   Analysis

### A. Standard of Review

When reviewing the denial of a motion to suppress, our "scope of review . . . is 'strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law.' " *State v. Bone*, 354 N.C. 1, 7, 550 S.E.2d 482, 486 (2001) (quoting *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982)). "[T]he trial court's conclusions of law are fully reviewable" de novo, and "this Court reviews the decision of the Court of Appeals for any error of law." *State v. Malone*, 373 N.C. 134, 145, 833 S.E.2d 779, 786–87 (2019). Ultimately, "[t]he question for review is whether the ruling of the trial court was correct and not whether the reason given therefor is sound or tenable. The crucial inquiry for this Court is admissibility and whether the ultimate ruling was supported by the evidence." *State v. Austin*, 320 N.C. 276, 290, 357 S.E.2d 641, 650 (1987) (citing *State v. Blackwell*, 246 N.C. 642, 644, 99 S.E.2d 867, 869 (1957)). Thus, "[a] correct decision of a lower court will not be disturbed on review simply because an insufficient or superfluous reason is assigned." *Id.*

## B. History of the Exclusionary Rule & Good Faith Exception

To begin, we briefly overview the history of the exclusionary rule and its good faith exception. Since the early days of our statehood, our state constitution has proscribed the use of "general warrants." N.C. Const. of 1776, Declaration of Rights, § XI. Since the eighteenth century, the United States Constitution has likewise forbidden "unreasonable searches and seizures," generally requiring warrants that "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.[3] Neither the United States Constitution nor its North

---

[3] Both Article I, Section 20 and the Fourth Amendment aimed to ensure that citizens were never again subjected to the manifest evils of "general warrants." *See Stanford v. Texas*, 379 U.S. 476, 481, 85 S. Ct. 506, 509–10 (1965); *State v. Hilton*, 378 N.C. 692, 713, 862 S.E.2d 806, 821 (2021). Originating in the sixteenth century, such warrants granted the Crown's agents "roving commissions to search where they pleased in order to suppress and destroy the literature of dissent." *Stanford*, 379 U.S. at 482, 85 S. Ct. at 510; *see also* 2 Thomas Erskine May, *The Constitutional History of England* 246 (Boston, Crosby & Nichols 1864) (describing general warrants as providing no charge or suspect, no named party, and no evidence of a crime). Closer to the Founding, "warrants were *sometimes* more specific in content, but they typically authorized the arrest and search of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named person thought to be connected with a libel." *Stanford*, 379 U.S. at 482–83, 85 S. Ct. at 510.

The Founding Fathers particularly loathed the writ of assistance. *Id.* at 482, 85 S. Ct. at 510 ("[T]he Fourth Amendment was most immediately the product of contemporary revulsion against a regime of writs of assistance . . . ."). These devices "had given customs officials blanket authority to search where they pleased for goods imported in violation of the British tax laws." *Id.* at 481, 85 S. Ct. at 510. "[I]n addition to authorizing search without limit of place, [writs of assistance] had no fixed duration." *Marcus v. Search Warrants*, 367 U.S. 717, 729 n.22, 81 S. Ct. 1708, 1715 n.22 (1961). In effect, writs of assistance gave the executing officials complete discretion to search at will, thereby "plac[ing] the liberty of every man in the hands of every petty officer." *Id.* (quoting William Tudor, *The Life of James Otis* 66 (Boston, Wells & Lilly 1823)). "[T]he consistent and overarching themes in colonial judicial resistance [to general warrants and writs of assistance] was opposition to their *unparticularized nature* and to the *unconstrained discretion* they therefore afforded a searcher." *Hilton*, 378 N.C. at 714, 862 S.E.2d at 821 (first alteration in original) (quoting

Carolina counterpart, however, specify what is to be done with evidence obtained from an unconstitutional search or seizure. *See Davis v. United States*, 564 U.S. 229, 231, 236, 131 S. Ct. 2419, 2423, 2426 (2011); *State v. Garner*, 331 N.C. 491, 506, 417 S.E.2d 502, 510 (1992). Thus, for over 124 years of our Nation's history, neither the federal courts nor the courts of this state excluded evidence that had been obtained from an unconstitutional search or seizure.[4] *See Carter*, 322 N.C. at 713, 370 S.E.2d at 556; *State v. McGee*, 214 N.C. 184, 185, 198 S.E. 616, 616–17 (1938).

In 1914, however, the Supreme Court decided *Weeks v. United States* and held that federal courts must suppress evidence obtained in violation of the Fourth Amendment, rendering it unusable against the defendant at trial. 232 U.S. at 398, 34 S. Ct. at 346. The Supreme Court has since clarified that the federal exclusionary "rule is prudential rather than constitutionally mandated." *Pa. Bd. of Prob. & Parole v. Scott*, 524 U.S. 357, 363, 118 S. Ct. 2014, 2019 (1998); *see also United States v. Leon*, 468 U.S. 897, 905–06, 104 S. Ct. 3405, 3411 (1984) (rejecting theories "that the exclusionary rule is a necessary corollary of the Fourth Amendment or . . . required by the conjunction of the Fourth and Fifth Amendments").

Because *Weeks* only concerned the Fourth Amendment, it did not immediately impact state courts. *See* 232 U.S. at 398, 34 S. Ct. at 346 ("[T]he [Fourth] Amendment

---

Fabio Arcila, Jr., *In the Trenches: Searches and the Misunderstood Common-Law History of Suspicion and Probable Cause*, 10 Univ. Pa. J. Const. L. 1, 13 (2007) (emphases added)).

[4] In fact, all American jurisdictions except for Iowa applied this rule. *See State v. Sheridan*, 96 N.W. 730, 731 (Iowa 1903).

is not directed to individual misconduct of [non-federal] officials."); *see also State v. Fowler*, 172 N.C. 905, 913, 90 S.E. 408, 411 (1916). Therefore, in the decades following *Weeks*, our courts continued to adhere to the traditional rule that evidence obtained in violation of Article I, Section 20 could be used at trial. *See McGee*, 214 N.C. at 185, 198 S.E. at 616–17.

Then, in 1937, the General Assembly enacted our state's first exclusionary rule (section 15-27).[5] This statutory exclusionary rule applied only as far as its terms provided, *see State v. Vanhoy*, 230 N.C. 162, 164–65, 52 S.E.2d 278, 280 (1949), and it did not have "the force and effect of rendering incompetent evidence obtained through a search *without a warrant*," *McGee*, 214 N.C. at 186, 198 S.E. at 617 (emphasis added). The courts operated thusly for the next several decades: federal courts generally excluded evidence obtained in violation of the Fourth Amendment, while the courts of this state only excluded evidence when required by statute.

In 1949, the Supreme Court incorporated "the core of the Fourth Amendment" into the Due Process Clause of the Fourteenth Amendment, rendering it "enforceable against the States." *Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S. Ct. 1359, 1361 (1949). Simultaneously, however, the Supreme Court declined to incorporate the federal

---

[5] "Any officer who shall sign and issue or cause to be signed and issued a search warrant without first requiring the complainant or other person to sign an affidavit under oath and examining said person or complainant in regard thereto shall be guilty of a misdemeanor; and no facts discovered by reason of the issuance of such illegal search warrant shall be competent as evidence in the trial of any action." An Act to Require All Peace Officers in the State of North Carolina to Give Bond for the Faithful Discharge of His or Her Duty, ch. 339, § 1½, 1937 N.C. Sess. Laws 670, 671 (codified at N.C. Code of 1943, § 15-27).

exclusionary rule. *Id.* at 33, 69 S. Ct. at 1364. Thus, the status quo ante remained.

In 1951, the General Assembly amended section 15-27 to expand the statutory exclusionary rule. The amendment provided that "no facts discovered or evidence obtained without a legal search warrant in the course of any search, made under conditions requiring the issuance of a search warrant, shall be competent as evidence in the trial of any action." An Act to Make Inadmissible in Evidence Any Facts Discovered or Evidence Obtained in the Course of an Illegal Search, ch. 644, § 1, 1951 N.C. Sess. Laws 601, 601 (codified as amended at N.C. Code of 1943, § 15-27 (Cum. Supp. 1951)).[6]

Ten years later, in *Mapp v. Ohio*, the Supreme Court incorporated the federal exclusionary rule into the Fourteenth Amendment's Due Process Clause, "hold[ing] that all evidence obtained by searches and seizures in violation of the [Federal] Constitution is, by that same authority, inadmissible in a state court." 367 U.S. 643,

---

[6] In 1957, the General Assembly also enacted section 15-27.1, which provided:

> The provision of this Article shall apply to search warrants issued for any purpose including those issued pursuant to the provisions of G.S. 18-13. No facts discovered or evidence obtained by reason of the issuance of an illegal search warrant or without a legal search warrant in the course of any search, made under conditions requiring a search warrant, shall be competent as evidence in the trial of any action.

An Act Amending Article 4, Chapter 15 of the General Statutes Relating to the Issuance of Search Warrants and to the Competence of Evidence Obtained in Making Searches, ch. 496, § 1, 1957 N.C. Sess. Laws 460, 460 (codified at N.C.G.S. § 15-27.1 (1965)). It did so in response to decisions of this Court holding that section 15-27's exclusionary rule was inapplicable to warrants issued under section 18-13. *See, e.g.*, *State v. Mock*, 259 N.C. 501, 503–04, 130 S.E.2d 863, 865 (1963); *State v. McLamb*, 235 N.C. 251, 255–56, 69 S.E.2d 537, 540 (1952).

655, 81 S. Ct. 1684, 1691 (1961). Thereafter, "the [S]tates [were] no longer free to adopt or reject at will the exclusionary rule as a means of enforcing the Fourth Amendment in state courts." *State v. Colson*, 274 N.C. 295, 306, 163 S.E.2d 376, 384 (1968). As a matter of state law, evidence continued to be suppressed only under the statutory exclusionary rule. *See, e.g., id.*; *State v. Stevens*, 264 N.C. 737, 740–41, 142 S.E.2d 588, 591–92 (1965).

About a decade after the Supreme Court's decision in *Mapp*, however, this Court began conflating the protections against unreasonable searches and seizures of the state constitution with those of the Federal Constitution. Specifically, this Court sometimes supported its statements that evidence resulting from unconstitutional searches and seizures must be suppressed with bare citations to the Fourth Amendment and Article I, Section 20 (or its predecessor). *See State v. Reams*, 277 N.C. 391, 395–96, 178 S.E.2d 65, 67–68 (1970) (providing no analysis of the state constitution), *overruled on other grounds by, State v. Worsley*, 336 N.C. 268, 443 S.E.2d 68 (1994); *State v. Small*, 293 N.C. 646, 656, 239 S.E.2d 429, 436 (1977) (same). Ostensibly, this Court recognized that, because the federal exclusionary rule now applied to the States, the federal rule provided the functional baseline protection. This Court did not independently analyze the meaning of our state constitution; rather, in both cases, it simply lumped the state constitution in with the Federal Constitution before ultimately determining that no unconstitutional searches or seizures took place, meaning exclusion was unnecessary in any event. *See Reams*, 277

N.C. at 395–400, 178 S.E.2d at 67–70; *see also Small*, 293 N.C. at 656, 239 S.E.2d at 436.

Throughout the 1970s, the General Assembly enacted sweeping reforms to the criminal justice system. Among them, the legislature reworded the statutory exclusionary rule and recodified it as section 15A-974. An Act to Amend the Laws Relating to Pretrial Criminal Procedure, ch. 1286, § 1, 1973 N.C. Sess. Laws (2d Sess. 1974) 490, 543 (codified as amended at N.C.G.S. § 15A-974 (1975)). Pertinently, this statutory exclusionary rule provided: "Upon timely motion, evidence must be suppressed if: . . . . Its exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina." N.C.G.S. § 15A-974(1) (1975).[7] This Court quickly identified, however, that if there is "no constitutionally mandated

---

[7] The remainder of section 15A-974 provided:

> Upon timely motion, evidence must be suppressed if:
>
> . . . .
>
> (2) It is obtained as a result of a substantial violation of the provisions of this Chapter. In determining whether a violation is substantial, the court must consider all the circumstances including:
>
> > a. The importance of the particular interest violated;
> >
> > b. The extent of the deviation from lawful conduct;
> >
> > c. The extent to which the violation was wilful [sic];
> >
> > d. The extent to which exclusion will tend to deter future violations of this Chapter.

An Act to Amend the Laws Relating to Pretrial Criminal Procedure, ch. 1286, § 1, 1973 N.C. Sess. Laws (2d Sess. 1974) at 543 (codified as amended at N.C.G.S. § 15A-974 (1975)).

exclusionary rule bar[ring] the admission of [evidence,] . . . [N.C.]G.S. § 15A-974(1) does not require that [the evidence] be suppressed." *State v. Richardson*, 295 N.C. 309, 322, 245 S.E.2d 754, 763 (1978).

As these developments were unfolding, the Supreme Court steadily "abandoned the old, 'reflexive' application of [the exclusionary rule]." *Davis*, 564 U.S. at 238, 131 S. Ct. at 2427. The Court began to "impose more rigorous weighing of the [exclusionary rule's] cost and deterrence benefits," *id.*, illustrating that the exclusionary rule is a prudential, judicially created rule, *see Herring v. United States*, 555 U.S. 135, 139, 129 S. Ct. 695, 699 (2009) ("The Fourth Amendment . . . 'contains no provision expressly precluding the use of evidence obtained in violation of its commands,' . . . " (quoting *Arizona v. Evans,* 514 U.S. 1, 10, 115 S. Ct. 1185, 1191 (1995)). This led to the recognition of several exceptions. *See, e.g.*, *Nix v. Williams*, 467 U.S. 431, 104 S. Ct. 2501 (1984) (inevitable discovery doctrine).

Relevant here, in 1984, the Supreme Court adopted a good faith exception to the federal exclusionary rule, allowing "evidence obtained in objectively reasonable good faith reliance on a subsequently invalidated search warrant" to be admitted. *Leon*, 468 U.S. at 922, 104 S. Ct. at 3420. The Court did so because of the "marginal or nonexistent benefits produced by suppressing" such evidence. *Id.* And since, the Supreme Court has "applied th[e] 'good[ ]faith' exception across a range of cases," including those involving "searches conducted in reasonable reliance on subsequently invalidated statutes." *Davis*, 564 U.S. at 238–39, 131 S. Ct. at 2428.

Notably, the same year that the Supreme Court decided *Leon*, this Court decided *State v. Arrington*. 311 N.C. 633, 319 S.E.2d 254 (1984). In that case, this Court recognized that it had never held that an exclusionary rule arises out of Article I, Section 20 of our state constitution, though some cases had so implied. *Id.* at 643–44, 319 S.E.2d at 261 (first citing *Small*, 293 N.C. 646, 239 S.E.2d 429, and then citing *Reams*, 277 N.C. 391, 178 S.E.2d 65, and then citing *Colson*, 274 N.C. 295, 163 S.E.2d 376).

Four years after *Leon* and *Arrington*, however, this Court decided *State v. Carter*. There this Court pronounced that our state constitution does contain an exclusionary rule. *Carter*, 322 N.C. at 712, 370 S.E.2d at 555. Then this Court considered and rejected the argument that state law independently included a good faith exception to the state exclusionary rule. *See id.* at 710, 724, 370 S.E.2d at 554, 562. This Court's rationale, however, was unclear. Although this Court novelly pronounced that "[o]ur state constitution, like the Federal Constitution, requires the exclusion of evidence obtained by unreasonable search and seizure," *id.* at 712, 370 S.E.2d at 555, it also recognized that the state exclusionary rule was "public policy" brought about by "statute rather than by judicial creation," *id.* at 714, 718–19, 721, 723–24, 370 S.E.2d at 556, 559–62. This Court ultimately stated that "[i]f a good faith exception is to be applied to this public policy, let it be done by the legislature, the body politic responsible for the formation and expression of matters of public policy." *Id.*

The decision in *Carter* left our state's exclusionary rule and good faith exception jurisprudence muddled and confused, engendering much legal debate. *Compare, e.g., Gore*, 272 N.C. App. at 112–13, 846 S.E.2d at 304 (Dillon, J., concurring in part & concurring in the result in part) (stating that "*Carter* . . . did not hold that the absence of a good faith exception under state law . . . was a *constitutional* matter" but rather was "a matter of public policy within the purview of our General Assembly's lawmaking authority"), *with, e.g., State v. Smith,* 124 N.C. App. 565, 576, 478 S.E.2d 237, 244 (1996) ("[U]nder North Carolina's Constitution, no good faith exception exists which might 'save' the fruits of a search made pursuant to an invalidated warrant." (citing *Carter*, 322 N.C. at 724, 370 S.E.2d at 562)). In 2011, the General Assembly interjected and enacted Session Law 2011-6 to amend section 15A-974, as indicated by the underlined text quoted below:

> The General Assembly of North Carolina enacts:
>
> **SECTION 1**: [N.C.]G.S. [§] 15A-974 reads as rewritten:
>
> "**§ 15A-974. Exclusion or suppression of unlawfully obtained evidence.**
>
> (a) Upon timely motion, evidence must be suppressed if:
>
> > (1) Its exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina; or
> >
> > (2) It is obtained as a result of a substantial violation of the provisions of this Chapter. . . .
> >
> > . . . .

> Evidence shall not be suppressed under this
> subdivision if the person committing the
> violation of the provision or provisions under this
> Chapter acted under the objectively reasonable,
> good faith belief that the actions were lawful.

. . . ."

> **SECTION 2.** The General Assembly respectfully
> requests that the North Carolina Supreme Court
> reconsider, and overrule, its holding in *State v. Carter* that
> the good faith exception to the exclusionary rule which
> exists under federal law does not apply under North
> Carolina State law.

An Act to Provide for the Adoption of the Good Faith Exception to the Exclusionary

Rule into State Law, S.L. 2011-6, §§ 1–2, 2011 N.C. Sess. Laws 10, 10–11 (underlining

changed to italics for "*State v. Carter*").

## C. Section 15A-974's Good Faith Exception

With this background in mind, we are poised to analyze whether the good faith

exception under N.C.G.S. § 15A-974 applies. When construing section 15A-974, the

cardinal goal is to accomplish the intent of the legislature. *See, e.g., State v. Jones*,

359 N.C. 832, 835, 616 S.E.2d 496, 498 (2005). Like all statutes, section 15A-974 is

merely a codification of the underlying session law, which is the actual act of the

General Assembly. Therefore, "the statement of a legislative enactment contained in

the Session Laws is controlling over the statement codified in the General Statutes."

*Custom Molders, Inc. v. Am. Yard Prods., Inc.*, 342 N.C. 133, 137, 463 S.E.2d 199, 202

(1995). "[W]hen the language . . . is clear and unambiguous[,] there is no room for

judicial construction and the court must give the statute its plain and definite

meaning without superimposing provisions or limitations not contained within the statute." *State v. Williams*, 291 N.C. 442, 446, 230 S.E.2d 515, 517 (1976).

Section 15A-974 requires the exclusion of two kinds of evidence. Subdivision 15A-974(a)(1) compels the exclusion of evidence that must be excluded under the Federal Constitution or the state constitution, whereas subdivision 15A-974(a)(2) requires the exclusion of evidence that is obtained in "substantial violation of" Chapter 15A's various provisions. Although the last sentence of subsection 15A-974(a) unquestionably creates a good faith exception, the statute's plain language indicates that it applies only to evidence that must be excluded under subdivision 15A-974(a)(2). This is because section 15A-974's good faith exception limits its scope to evidence obtained by a "person committing the violation of the provision or provisions under [Chapter 15A]." N.C.G.S. § 15A-974(a)(2) (2023). This directive correlates only to the evidence that must be excluded under subdivision 15A-974(a)(2). *See id.*

This interpretation is consistent with separation of powers. It shows that the General Assembly recognized that if an exclusionary rule arises out of our state constitution, only this Court could determine that such exclusionary rule has a good faith exception. *See Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6–7 (1787) ("[N]o act th[e General Assembly] could pass[ ] could by any means repeal or alter the constitution . . . ."). Thus, the General Assembly prescribed a good faith exception to evidence that would otherwise be excluded because it was obtained in violation of

Chapter 15A's provisions, but it did not—and indeed, could not—prescribe a good faith exception to evidence that would be excluded pursuant to any exclusionary rule arising out of our state constitution.

Here the Court of Appeals determined that defendant's motion to suppress the CSLI should have been allowed in accordance with subdivision 15A-974(a)(1) because the CSLI was obtained in violation of defendant's constitutional rights. *Rogers*, slip op. at 22. The Court of Appeals did not conclude, and the parties do not contend, that the CSLI was obtained as a result of substantial violations of Chapter 15A's provisions, thereby implicating subdivision 15A-974(a)(2). In fact, the Court of Appeals determined that defendant procedurally waived any such argument. *Rogers*, slip op. at 12. Thus, the good faith exception contained in subdivision 15A-974(a)(2) cannot prevent the CSLI from being suppressed.

**D. Suppression Analysis Under Subdivision 15A-974(a)(1)**

As previously noted, though, the trial court denied defendant's motion to suppress, and the ultimate "inquiry for this Court is admissibility and whether the ultimate ruling was supported by the evidence." *Austin*, 320 N.C. at 290, 357 S.E.2d at 650. Thus, we must decide whether the trial court was correct in denying defendant's motion to suppress. *Id.* Subdivision 15A-974(a)(1) requires trial courts to suppress evidence only when "[i]ts exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina." N.C.G.S. § 15A-974(a)(1) (2023). After considering the parties' briefs and the authorities

referenced therein, we conclude that neither the Federal Constitution nor the state constitution required the exclusion of CSLI here. In conducting our analysis, we accept the General Assembly's request to "reconsider" *Carter* and clarify our jurisprudence regarding Article I, Section 20 of our state constitution. *See* S.L. 2011-6, § 2, 2011 N.C. Sess. Laws at 10–11.

### 1. *The Federal Constitution*

We first consider whether the Federal Constitution requires exclusion of the CSLI. We note that although subdivision 15A-974(a)(1) expressly requires courts to consider whether the evidence's "exclusion is required by the Constitution of the United States," N.C.G.S. § 15A-974(a)(1) (2023), courts would do so regardless of a statutory provision. This is because the Fourth Amendment and the attendant federal exclusionary rule have been incorporated into the Fourteenth Amendment's Due Process Clause and rendered applicable to the States. And in our system of dual sovereignty, "[e]ven when a state constitutional provision provides less protection than a parallel federal provision, . . . [state courts] must nevertheless apply the Federal Constitution's protections." *State v. Tirado*, 387 N.C. 104, 112, 911 S.E.2d 51, 59 (2025). Indeed, because the Federal Constitution is "the supreme law of the land, the rights *it* guarantees must be applied to every citizen by the courts of North Carolina, so no citizen will be accorded lesser rights no matter how we construe the state constitution." *Id.* (quoting *State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998)) (citation modified). In other words, North Carolina's courts "must ensure

-20-

that the Federal Constitution's protections are given full effect regardless of how [this Court] construe[s] the state constitution." *Id.* at 128, 911 S.E.2d at 69.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. As discussed, "[t]he Fourth Amendment . . . 'contains no provision expressly precluding the use of evidence obtained in violation of its commands.'" *Herring*, 555 U.S. at 139, 129 S. Ct. at 699 (quoting *Evans,* 514 U.S. at 10, 115 S. Ct. at 1191). Yet the Supreme Court applies a judicially created exclusionary rule that, "*when applicable*, forbids the use of improperly obtained evidence at trial." *Id.* at 139, 129 S. Ct. at 699 (emphasis added) (citing *Weeks,* 232 U.S. at 398, 34 S. Ct. at 346).

This federal "exclusionary rule is *not* an individual right and applies only where it 'result[s] in appreciable deterrence'" of police misconduct. *Id.* at 141, 129 S. Ct. at 700 (alteration in original) (emphasis added) (quoting *Leon,* 468 U.S. at 909, 104 S. Ct. at 3413); *see also State v. Julius*, 385 N.C. 331, 341, 892 S.E.2d 854, 862 (2023) ("'[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence' by law enforcement." (quoting *Herring*, 555 U.S. at 144, 129 S. Ct. at 702)). Thus, the Supreme Court has not held rigidly to its exclusionary rule, applying it only "where

its remedial objectives are thought most efficaciously served" and creating several exceptions. *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 620 (1974).

The good faith exception allows "evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause" to "be use[d] in the prosecution's case in chief." *Leon*, 468 U.S. at 900, 104 S. Ct. at 3409; *accord State v. Welch*, 316 N.C. 578, 588, 342 S.E.2d 789, 794 (1986). The Supreme Court adopted the good faith exception because "where the officer's conduct is objectively reasonable, . . . [e]xcluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty." *Leon*, 468 U.S. at 919–20, 104 S. Ct. at 3419 (quoting *Stone v. Powell*, 428 U.S. 465, 539–40, 96 S. Ct. 3037, 3073–74 (1976) (White, J., dissenting)). And "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope[,] [i]n most such cases, there is no police illegality and thus nothing to deter." *Id.* at 920–21, 104 S. Ct. at 3419; *see also id.* at 921, 104 S. Ct. at 3419 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. 'Once the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law.' " (quoting *Stone*, 428 U.S. at 498, 96 S. Ct. at 3054 (Burger, C.J., concurring)). Thus, the Fourth Amendment does not usually require evidence obtained pursuant to a subsequently invalidated warrant to be excluded.

Notably, courts have extended the good faith exception to other forms of judicial authorization, not just warrants. For example, this Court has extended the federal good faith exception to cover an officer's objectively reasonable reliance on the trial court's issuance of a nontestimonial identification order that is subsequently invalidated. *See Welch*, 316 N.C. at 589, 342 S.E.2d at 795.

The good faith exception, however, is ultimately premised on whether law enforcement's reliance on judicial authorization was objectively reasonable. *See Herring*, 555 U.S. at 142, 129 S. Ct. at 701 ("We (perhaps confusingly) called this objectively reasonable reliance 'good faith.' "). And although " 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search,' " *Leon*, 468 U.S. at 922, 104 S. Ct. at 3420 (quoting *United States v. Ross*, 456 U.S. 798 823 n.32, 102 S. Ct. 2157, 2172 n.32 (1982)), there are some instances when reliance on judicial authorization will not be objectively reasonable, *see id.* at 923, 104 S. Ct. at 3421. An officer's reliance would not be objectively reasonable, and suppression would be required, if (1) the officer gave the judge or magistrate information he "knew was false or would have known was false except for his reckless disregard of the truth"; (2) "the issuing magistrate wholly abandoned his judicial role" as a neutral and detached arbiter; (3) the officer's affidavit was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and/or (4) a warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid" (i.e., it "fail[s] to

particularize the place to be searched or the things to be seized"). *Id.* (first citing *Franks v. Delaware*, 438 U.S. 154, 164–65, 171–72, 98 S. Ct. 2674, 2681, 2684–85 (1978), then citing *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–27, 99 S. Ct. 2319, 2324–25 (1979), then citing *Brown v. Illinois*, 422 U.S. 590, 610–11, 95 S. Ct. 2254, 2265–66 (1975) (Powell, J., concurring in part), and then citing *Massachusetts v. Sheppard*, 468 U.S. 981, 988–91, 104 S. Ct. 3424, 3428–30 (1984)).

In this analysis, "[t]he suppression of evidence should 'always be[ ] our last resort, not our first impulse.' " *Julius*, 385 N.C. at 341, 892 S.E.2d at 862 (alteration in original) (quoting *Hudson v. Michigan,* 547 U.S. 586, 591, 126 S. Ct. 2159, 2163 (2006)). After all, the exclusionary rule exacts "substantial social costs," namely, "imped[ing] . . . the truth-finding functions of judge and jury," and permitting "some guilty defendants [to] go free or receive reduced sentences as a result of favorable plea bargains." *Leon*, 468 U.S. at 907, 104 S. Ct. at 3412 (quoting in part *United States v. Payner*, 447 U.S. 727, 734, 100 S. Ct. 2349, 2445 (1980)). We are also guided by the Supreme Court's admonition that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness." *Id.* at 922, 104 S. Ct. at 3420 (quoting *Illinois v. Gates*, 462 U.S 213, 267, 103 S. Ct. 2317, 2347 (1983) (White, J., concurring in judgment)).

The State contends that Detective Wenk's reliance on the Section 2703(d) Order to obtain the CSLI data was objectively reasonable, bringing the challenged evidence within the good faith exception. Defendant, however, maintains that even if

we apply the good faith exception analysis to the facts of this case, the exception does not apply here because it was objectively unreasonable for the officers to rely on the order. We agree with the State.

Detective Wenk had been investigating allegations of cocaine trafficking and had spoken with a confidential source before he applied for the Section 2703(d) Order. Seeking to investigate the allegations further, Detective Wenk applied to the trial court for permission to, inter alia, monitor the disputed CSLI. His application included all the statutorily required information. *See* N.C.G.S. § 15A-262(b)(1)–(2) (2023); 18 U.S.C. § 2703(d). Detective Wenk included an affidavit that cataloged the information he had learned to that point, specifically including the information from the confidential source regarding defendant's cocaine trafficking and distribution operation and trips to California. On that basis, the trial court determined there was probable cause and granted Detective Wenk's application. Detective Wenk, in reliance upon the Section 2703(d) Order, then monitored defendant's CSLI as permitted.

Following the trial court's ruling, it was not Detective Wenk's responsibility to second-guess the trial court's probable cause determination or the Section 2703(d) Order's legal sufficiency.[8] Furthermore, defendant does not allege that Detective Wenk acted in bad faith, such as by providing the trial court knowingly false

---

[8] Unlike panels of judges sitting on appeal, a police officer is not expected to conduct a thorough legal analysis to review whether a trial court has correctly determined that there was probable cause to search based upon information that the officer himself provided.

information, nor does defendant suggest that the trial court "wholly abandoned [its] judicial role."

At most, defendant maintains that the good faith exception cannot apply here because Detective Wenk's application and affidavit were "bare bones," meaning they were "so lacking in indicia of probable cause" that the Section 2703(d) Order was " 'so facially deficient' that reliance upon it was not reasonable." Defendant mistakenly blends several of *Leon*'s limitations on the good faith exception. Nevertheless, we disagree with defendant's underlying premises.

First, the Section 2703(d) Order was not "facially deficient" as meant in *Leon*. The Supreme Court used "facially deficient" to describe a warrant that did not particularly describe the place to be searched or the thing to be seized. Here, however, the Section 2703(d) Order clearly identified what was to be searched—CSLI related to defendant's cell phone. Second, Detective Wenk's affidavit was not "bare bones," and it was not "so lacking . . . as to render official belief in [probable cause's] existence *entirely* unreasonable." *Leon*, 468 U.S. at 923, 104 S. Ct. at 3421 (emphasis added) (quoting *Brown v. Illinois*, 422 U.S. 590, 610–11, 95 S. Ct. 2254, 2265 (1975) (Powell, J., concurring in part)); *cf. United States v. Perez*, 393 F.3d 457, 462 (4th Cir. 2004) (concluding that an officer's reliance on a warrant "was objectively reasonable" even though "the information supplied . . . within the four corners of his affidavit le[ft] much to be desired" by failing to clarify the informant's identity, whether he was known, and the basis for his reliability and credibility).

Ultimately, Detective Wenk did his job; he investigated, presented the known information, and requested permission from a neutral, detached judge to search defendant's CSLI, receiving permission to do so. Although the Court of Appeals subsequently ruled that the affidavit was insufficient to establish the requisite probable cause, it was not incumbent upon Detective Wenk to forecast the legal intricacies that would ultimately determine the order's legality.

Our decision in this regard is like that in *Welch*. There a trial court issued a nontestimonial identification order under Chapter 15A that a law enforcement officer relied on to draw the defendant's blood. *Welch*, 316 N.C. at 584–85, 589, 342 S.E.2d at 792–93, 795. This Court ultimately determined that the blood draw violated the Fourth Amendment, but it nevertheless noted that the officer

> went before a superior court judge, a "detached and neutral magistrate," who issued a nontestimonial identification order based on an affidavit that set forth facts establishing (1) probable cause to believe that an offense punishable by imprisonment for more than one year had been committed, (2) reasonable grounds to suspect that the defendant[ ] committed the offense, and (3) [that] the results will materially aid in determining whether the person committed the offense [as required under N.C.G.S. § 15A-273 (1973)].

*Id.* at 589, 342 S.E.2d at 795. This Court therefore "decline[d] to apply the exclusionary rule to this good[ ]faith violation of the [F]ourth [A]mendment" because "the officer reasonably relied on the order that was issued by the judge" and "took every reasonable step to comport with [F]ourth [A]mendment requirements." *Id.*

Like the situation in *Welch*, it was objectively reasonable for Detective Wenk

to rely on the trial court's determination in the Section 2703(d) Order that there was probable cause to collect the CSLI. Excluding the evidence here would not meaningfully deter police misconduct because there was no such misconduct. Detective Wenk followed proper steps to obtain the Section 2703(d) Order—he submitted an application and affidavit to the trial court, then reasonably believed that the trial court's granting the Section 2703(d) Order deemed it legally sufficient. Thus, "[t]o apply the [exclusionary] rule here would not serve to discourage police misconduct and would only defeat justice for no good reason." *Id.* at 589, 342 S.E.2d at 792–93. We therefore hold Detective Wenk's reliance on the Section 2703(d) Order to be reasonable, and the evidence obtained therefrom to be covered by the federal good faith exception. Accordingly, the CSLI's exclusion is not "required by the Constitution of the United States," N.C.G.S. § 15A-974(a)(1) (2023), so subdivision 15A-974(a)(1) does not compel the exclusion of the CSLI on that basis.

### 2. The State Constitution

Having determined that the Federal Constitution does not compel exclusion of the CSLI, we now turn to the state constitution. *See* N.C.G.S. § 15A-974(a)(1) (2023). "Every [state] constitutional inquiry examines the text of the relevant provision, the historical context in which the people of North Carolina enacted it, and this Court's precedents interpreting it." *Tirado*, 387 N.C. at 115, 911 S.E.2d at 61. We start with the plain language of the text because "[t]he people used that plain language to express their intended meaning of the text when they adopted it." *Id.* at 115–16, 911

S.E.2d at 61 (quoting *Harper v. Hall*, 384 N.C. 292, 297, 886 S.E.2d 393, 399 (2023)). "Where the meaning is clear from the words used, we will not search for a meaning elsewhere." *Cmty. Success Initiative v. Moore*, 384 N.C. 194, 213, 886 S.E.2d 16, 33 (2023) (citation modified). We then use "the historical background against which the people enacted the constitutional text . . . to isolate the provision's meaning at the time of ratification." *Tirado*, 387 N.C. at 116, 911 S.E.2d at 61 (citation modified). Finally, our inquiry is supplemented with "any on-point precedents from this Court interpreting the provision." *Id.* (quoting *Cmty. Success*, 384 N.C. at 213, 886 S.E.2d at 33).

In Article I, Section 20, the people of North Carolina declared: "General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted." N.C. Const. art. I, § 20. This provision has appeared in every version of our constitution with little alteration to the text.[9]

---

[9] *Compare* N.C. Const. art. I, § 20, *with* N.C. Const. of 1868, amends. of 1875, art. I, § 15 ("General warrants, whereby any officer or messenger may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offence is not particularly described and supported by evidence, are dangerous to liberty and ought not to be granted."), *and* N.C. Const. of 1868, art. I, § 15 (same), *and* N.C. Const. of 1776, amends. of 1835, Declaration of Rights, § 11 ("That general warrants, whereby any officer or messenger may be commanded to search suspected places, without evidence of the fact committed, or to seize any person or persons not named, whose offence is not particularly described and supported by evidence, are dangerous to liberty, and ought not to be granted."), *and* N.C. Const. of 1776, Declaration of Rights, § XI (same except for differences in spelling and capitalization).

Article I, Section 20's plain text prohibits "general warrants," and it specifically identifies two kinds of warrants: "warrants to search suspected places and warrants to arrest ('to seize') a person or persons." John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 73 (2d ed. 2013) [hereinafter *State Constitution*]. In the context of search warrants, Article I, Section 20 defines a general warrant as one "without evidence of the act committed." N.C. Const. art. I, § 20. In the context of arrest warrants, it defines a general warrant as one in which the "person [is] . . . not named" and the "offense is not particularly described and supported by evidence." *Id.* Thus, general warrants are "warrants that are not supported by evidence and that do not name names." *Hilton*, 378 N.C. at 713, 862 S.E.2d at 821 (quoting *State Constitution* 73).

"[T]he ban on general warrants reflect[ed] the colonial experiences with abuses of the procedures of criminal investigation by the authorities." *Id.* at 713–14, 862 S.E.2d at 821 (quoting *State Constitution* 73). "[I]ndiscriminate searches and arrests" authorized by general warrants "disturb[ed] the routines of ordinary life and instill[ed] fear of the forces of law and order." *State Constitution* 73. Thus, the people required their state government to use specific warrants to investigate crimes. *Id.*

As we have discussed, however, Article I, Section 20 does not provide what is to be done with evidence that has been obtained in violation of its provisions. *See Garner*, 331 N.C. at 506, 417 S.E.2d at 510. Thus, as a matter of the constitutional text, Article I, Section 20 does not require exclusion of such evidence at trial.

History and precedent confirm this textual conclusion. Indeed, for the first 161 years of our statehood, our courts did not apply an exclusionary rule to evidence obtained by unconstitutional searches and seizures. *See, e.g., McGee*, 214 N.C. at 185, 198 S.E. at 616–17. In fact, despite the appearance of Article I, Section 20's virtually identical predecessors in every iteration of the state constitution, this Court expressly *disallowed* the exclusion of competent, relevant evidence solely because it was obtained in violation of the state constitution. *See id.* (collecting cases). And although the General Assembly enacted a statutory exclusionary rule in 1937, this Court clarified that the statute was "a modification, and not an abrogation, of the common law rule," refusing to "give[ ] [it] . . . force and effect" beyond its terms. *Id.* at 186, 198 S.E. at 617. In other words, this Court would only exclude evidence to the extent required *by statute*; otherwise, the traditional rule continued uninterrupted. *See id.*; *see also Vanhoy*, 230 N.C. at 164–65, 52 S.E.2d at 280; *State v. Rhodes*, 233 N.C. 453, 455, 64 S.E.2d 287, 289 (1951). Even following later amendments, this Court continued to recognize the exclusionary rule only as a matter of statute. *See, e.g.*, *Colson*, 274 N.C. at 306, 163 S.E.2d at 384; *Stevens*, 264 N.C. at 741, 142 S.E.2d at 592; *Richardson*, 295 N.C. at 322, 245 S.E.2d at 763.

In 1968, after the Supreme Court decided *Mapp*, this Court decided *State v. Colson*. In *Colson*, a criminal defendant argued that evidence should have been excluded from trial because it was taken in violation of the Federal Constitution and our state constitution. 274 N.C. at 305, 163 S.E.2d at 383. This Court, however, did

not analyze whether any exclusionary rule arises out of our state constitution. Instead, this Court discussed the history of the exclusionary rule, including the Supreme Court's pronouncement that the federal exclusionary rule arising out of the Fourth Amendment applies to the States. *Id.* at 305–06, 163 S.E.2d at 383–84 (discussing *Mapp*, 367 U.S. 643, 81 S. Ct. 1684). This Court then likened the federal exclusionary rule to our state *statutory* exclusionary rule. *Id.* at 306, 163 S.E.2d at 384.

But in the years following *Colson*, this Court began to sow seeds of confusion into our constitutional criminal procedure jurisprudence. *See Reams*, 277 N.C. at 395–96, 178 S.E.2d at 67–68; *Small*, 293 N.C. at 656, 239 S.E.2d at 436. This Court, without any constitutional analysis, simply cited the state constitution, the Federal Constitution, and *Colson* to state that "evidence obtained by an unreasonable search and seizure is inadmissible." *Reams*, 277 N.C. at 395, 178 S.E.2d at 67; *Small*, 293 N.C. at 656, 239 S.E.2d at 436 (capitalization modified).[10] It is notable that, in each case, this Court cited both the Fourth Amendment to the Federal Constitution and Article I, Section 20 (or its predecessor) of our state constitution. This Court went on to decide in both cases that no unconstitutional search or seizure took place; thus, the exclusionary rule was not implicated in either case. *Reams*, 277 N.C. at 395–400, 178 S.E.2d at 67–70; *Small*, 293 N.C. at 656, 239 S.E.2d at 436.

---

[10] In *Reams*, this Court also cited *Mapp* and section 15-27. 277 N.C. at 395, 178 S.E.2d at 67.

Then in 1984, when presented with the question of whether an exclusionary rule arises out of Article I, Section 20, this Court stated:

> [A]pplication of the totality of circumstances test leads us to hold that there was a substantial basis for the finding of probable cause in the present case. Therefore, we need not consider or decide whether the guarantees against unreasonable searches and seizures in Article [I], Section 20 of the Constitution of North Carolina require the exclusion of evidence seized under a search warrant not supported by probable cause. *See, e.g., State v. Small*, 293 N.C. 646, 239 S.E.[2d] 429 (1977) (implying an exclusionary rule arising from Article [I], Section 20); *State v. Reams*, 277 N.C. 391, 178 S.E.[2d] 65 (1970) (same); *State v. Colson*, 274 N.C. 295, 163 S.E.[2d] 376 (1968) (same).

*Arrington*, 311 N.C. at 643–44, 319 S.E.2d at 261. This quote and the accompanying citations show that, as of 1984, there was an implication that an exclusionary rule arises out of Article I, Section 20, though the issue had never been decided.

Four years later, however, this Court announced for the first time that Article I, Section 20 contains an exclusionary rule. *Carter*, 322 N.C. at 710, 712, 723–24, 370 S.E.2d at 554–55, 561–62. In *Carter*, this Court simply proclaimed, without explanation, that Article I, Section 20 "requires the exclusion of evidence obtained by unreasonable search and seizure." *Id.* at 712, 370 S.E.2d at 555 (first citing *Reams*, 277 N.C. at 395, 178 S.E.2d at 67, and then citing *Colson*, 274 N.C. 295, 163 S.E.2d 376). After doing so, this Court analyzed whether this theretofore unknown constitutional exclusionary rule contained a good faith exception, concluding that it did not. *Id.* at 724, 370 S.E.2d at 562.

As an initial note, we observe that *Carter*'s proclamation that an exclusionary rule arises out of Article I, Section 20 is dubious. Indeed, *Carter* is a confused opinion. This Court began by misunderstanding two of the Court's prior decisions: *State v. Reams* and *State v. Colson*. Specifically, this Court cited to *Reams* and *Colson* to proclaim "[o]ur state constitution, like the Federal Constitution, requires the exclusion of evidence obtained by unreasonable search and seizure." *Carter*, 322 N.C. at 712, 370 S.E.2d at 555. Neither of these decisions, however, supports the proposition that an exclusionary rule stems from Article I, Section 20 (or its predecessors). In *Reams*, this Court did nothing more than state "evidence obtained by unreasonable search and seizure is inadmissible" and lump Article I, Section 20 into a string citation alongside section 15-27 and federal authorities, including the Fourth Amendment. 277 N.C. at 395, 178 S.E.2d at 67.[11] Similarly, although in *Colson* this Court stated that "the [S]tates are no longer free to adopt or reject at will the exclusionary rule *as a means of enforcing the Fourth Amendment in state courts*," 274 N.C. at 306, 163 S.E.2d at 384 (emphasis added), this Court did not imply that the state constitution had an analogous exclusionary rule. To the contrary, this Court specifically observed that "[t]he federal exclusionary rule enunciated in *Weeks* became *statutory law* in North Carolina long before *Mapp by enactment*." *Id.* (emphases added).

Additionally, *Carter*'s unprecedented pronouncement that an exclusionary rule

---

[11] Any reliance on *Small* would be misplaced for the same reasons.

arises out of Article I, Section 20 is undermined by the opinion itself, wherein this Court counterintuitively acknowledged throughout that any state exclusionary rule was the creature of statute, not of the state constitution. For instance, this Court remarked that, in reference to the enactment of section 15-27, North Carolina's exclusionary rule was "[the State's] expressed *public policy* since 1937." *Carter*, 322 N.C. at 714, 370 S.E.2d at 556 (emphasis added); *see also id.* at 719, 721, 723, 370 S.E.2d at 559, 560, 561 (similar). The Court later observed that "North Carolina was among a handful of [S]tates that adopted an exclusionary rule *by statute rather than by judicial creation.*" *Id.* at 719, 370 S.E.2d at 559 (emphasis added). These concessions further support the conclusion that, in *Carter*, this Court incorrectly stated that Article I, Section 20 compels the exclusion of evidence obtained in violation of its terms.

Then, when concluding that there was no good faith exception to Article I, Section 20's exclusionary rule, this Court remarkably proclaimed that it was the General Assembly's responsibility to adopt any such exception, observing that such a determination should "be done by the legislature, the body politic responsible for the formation and expression of matters of public policy." *Id.* at 724, 370 S.E.2d at 562. This proclamation reveals a fundamental misunderstanding of our constitutional framework. If a state exclusionary rule were of constitutional pedigree, "no act th[e General Assembly] could pass[ ] could by any means repeal or alter" it. *Bayard*, 1 N.C. (Mart.) at 6–7. This is because the state constitution, as the fundamental law

of the land, prevails over inconsistent acts of the legislature. *See id.* Moreover, the General Assembly may not dictate this Court's interpretation of the state constitution. *See id.*; *cf. City of Boerne v. Flores*, 521 U.S. 507, 519, 117 S. Ct. 2157, 2164 (1997) ("Congress does not enforce a constitutional right by changing what the right is.").[12] Thus, it would have been legally impossible for the General Assembly to *legislatively* enact a good faith exception to any state *constitutional* exclusionary rule. This internal inconsistency further underscores *Carter*'s lack of persuasiveness.

In addition to this crucial internal inconsistency, the most fundamental error on the part of this Court in *Carter* is that, in announcing the existence of an exclusionary rule in our state constitution and determining that such rule did not contain a good faith exception, this Court did not evaluate Article I, Section 20's text, consider the historical context, or reconcile itself with precedents expressly disclaiming any exclusionary rule other than as provided by statute. *See id.* at 712, 370 S.E.2d at 555. As we have explained, all three factors indicate that our constitution does not express an exclusionary rule. Thus, this Court's novel proclamation in *Carter* that an exclusionary rule arises under Article I, Section 20 appears untenable.

What is more, in decisions in *Carter*'s aftermath, this Court began to circumscribe it. For example, in *State v. Garner*, this Court acknowledged *Carter*'s

---

[12] Of course, the General Assembly may initiate the amendment of the state constitution in compliance with Article XIII, Section 4.

proclamation that the state constitution includes an exclusionary rule. 331 N.C. at 505–06, 417 S.E.2d at 510. Yet the Court noted that "there is no provision in our [s]tate [c]onstitution which explicitly calls for the exclusionary rule," *id.* at 504, 417 S.E.2d at 509 (acknowledging the defendant's concession to this effect), and we decisively rejected the defendant's argument that Article I, Section 20 "calls for 'broader' protection than that of the Fourth Amendment," *id.*; *see also id.* at 506, 417 S.E.2d at 510. This Court stated that "it is abundantly clear that the language of this provision of our [c]onstitution, relating entirely to 'general warrants[ ]' of the past *(while still relevant to protect against any recurrence of the historic abuses specified), should not be viewed as a vehicle for any inventive expansion of our law*." *Id.* at 506, 417 S.E.2d at 510 (emphasis added). *Garner* thus recognized that *Carter*'s declaration of a state constitutional exclusionary rule lacked a basis in the constitutional text, and it expressly declared instead that this Court would not use Article I, Section 20 to provide criminal defendants more protection than the Fourth Amendment, thereby isolating *Carter*.

For all these reasons, *Carter* is expressly overruled. Without *Carter*, our precedent only implies that an exclusionary rule arises from Article I, Section 20, though it has never been formally decided. *See Arrington*, 311 N.C. at 643–44, 319 S.E.2d at 261. The parties, however, did not request this Court to consider whether an exclusionary rule arises out of Article I, Section 20. The parties have only briefed whether any exclusionary rule arising under Article I, Section 20 contains a good

faith exception. Therefore, because we are not presented with the issue, we assume without deciding that an exclusionary rule arises from Article I, Section 20 of our state constitution. We leave that issue for a future case.

With that, we are left to decide whether any exclusionary rule arising under Article I, Section 20 contains a good faith exception. The State asks us to adopt a good faith exception in line with the federal good faith exception. While "we interpret the North Carolina Constitution independently of the United States Supreme Court's interpretation of the Federal Constitution," *Tirado*, 387 N.C. at 112, 911 S.E.2d at 59 (citing *Holmes v. Moore*, 384 N.C. 426, 437, 886 S.E.2d 120, 130 (2023)), we are persuaded by the reasoning articulated by the Supreme Court for adopting a federal good faith exception in *Leon*, 468 U.S. 897, 104 S. Ct. 3405. After all, when "[c]onsidering the precise wording of Article I, Section 20, we find no support . . . that the 'text' itself calls for 'broader' protection than that of the Fourth Amendment." *Garner*, 331 N.C. at 506, 417 S.E.2d at 510. Thus, we adopt the Supreme Court's reasoning in *Leon*, 468 U.S. 897, 104 S. Ct. 3405, to hold that there is a good faith exception to any exclusionary rule arising from Article I, Section 20 of our state constitution equivalent to the federal good faith exception to the exclusionary rule arising out of the Fourth Amendment.

Finally, we apply our state good faith exception to the facts of this case. We have already determined that the federal good faith exception applies here. Therefore, our state good faith exception, being equivalent to the federal good faith

exception, also applies. Accordingly, the exclusion of the CSLI is not "required by . . . the Constitution of the State of North Carolina," N.C.G.S. § 15A-974(a)(1) (2023), meaning subdivision 15A-974(a)(1) does not compel exclusion of the CSLI on that basis, *see Richardson*, 295 N.C. at 322, 245 S.E.2d at 763.

## III.    Conclusion

In sum, section 15A-974's good faith exception applies only to evidence obtained in substantial violation of Chapter 15A's provisions. Thus, section 15A-974's good faith exception does not spare the CSLI from suppression in this instance. Nevertheless, we conclude that the trial court correctly denied defendant's motion to suppress because neither the United States Constitution nor the North Carolina Constitution require the exclusion of the CSLI. We accordingly reverse the decision of the Court of Appeals.

REVERSED.

Justice DIETZ did not participate in the consideration or decision of this case.

Justice EARLS dissenting.

The exclusionary rule embodies "a more majestic conception" of constitutional protections—one that "restrains the sovereign itself" and ensures that constitutional "prohibitions are observed in fact." *Herring v. United States*, 555 U.S. 135, 157 (2009) (Ginsburg, J., dissenting). The principles *State v. Carter*, 322 N.C. 709 (1988), embraced—judicial integrity, a constitutional right to a remedy, and a deterrence model focused on shaping institutional behavior—are no less vital now than they were in 1988 and in the decades since. This Court should stand by them. I would reaffirm *Carter* and its progeny and hold that Article I, Section 20 requires exclusion of unconstitutionally obtained evidence with no good faith exception. I respectfully dissent.

## I.    *Carter* **and North Carolina's Exclusionary Rule**

In basic terms, the state constitutional exclusionary rule prevents the state from using evidence it obtained unlawfully against those accused of a crime in a court of law. Nearly forty years ago, this Court in *State v. Carter*, rooted the state exclusionary rule in three complementary principles: deterring police misconduct, safeguarding judicial integrity, and ensuring that every right indeed has a remedy. A court, we said, cannot hand down the law while profiting from its breach. On that view, we declined to graft a good-faith exception onto the exclusionary rule. These fundamental principles still emanate from Article I, Section 20 and are grounds to

maintain *Carter*'s vitality.

Start with the hallmark constitutional value of judicial integrity. Courts are not merely passive arbiters—they are co-equal branches of government bound by the same constitutional constraints that limit the executive and legislative branches. Justice Brandeis captured this principle powerfully:

> Decency, security, and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperiled if it fails to observe the law scrupulously. Our government is the potent, the omnipresent, teacher. For good or for ill, it teaches the whole people by its example.

*Olmstead v. United States*, 277 U.S. 438, 485 (1928) (Brandeis, J., dissenting), *overruled by Katz v. United States,* 389 U.S. 347, 352–53 (1967).

*Carter* embraced this understanding: "The preservation of the right to be protected from unreasonable search and seizure guaranteed by our state constitution demands that the courts of this state not condone violations thereof by admitting the fruits of illegal searches into evidence." *Carter*, 322 N.C. at 719. We recognized that courts cannot maintain their legitimacy while profiting from constitutional violations. As Justice Day wrote in *Weeks v. United States*:

> The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution, and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights.

232 U.S. 383, 392 (1914).

Judicial integrity is not some abstract aspiration—it is fundamental to the separation of powers and the rule of law embedded in our constitutional structure. Article IV, Section 1 of our state's constitution vests "[t]he judicial power of the State" in the courts. When courts admit evidence obtained through constitutional violations, they exercise judicial power in furtherance of executive branch lawlessness. This makes the judiciary complicit in constitutional violations, undermining the very separation of powers the constitution establishes.

Moreover, extensive evidence supports that judicial integrity matters to constitutional legitimacy. The North Carolina Code of Judicial Conduct's first canon requires judges to "uphold the integrity . . . of the judiciary." Recent cases from this Court emphasize this foundational principle: *In re Clontz*, 376 N.C. 128, 142 (2020) (reprimanding conduct that "undermines public faith and confidence in the judiciary"); *Harper v. Hall*, 384 N.C. 292, 373 (2023) (observing that a court's authority "ultimately rests on sustained public confidence in its moral sanction").

Compellingly too, empirical evidence shows that the exclusionary rule serves judicial integrity while the good faith exception undermines it. One study measured public perceptions of judicial integrity and found that participants in the United States had 62.47% confidence in courts when the exclusionary rule applied compared to only 46.49% confidence when it did not apply. Matthew D. Kim, *The Exclusionary Rule and Judicial Integrity: An Empirical Study of Public Perceptions of the*

*Exclusionary Rule*, 87 Mo. L. Rev. 1061, 1099 (2022). The study found that the good faith exception reduced public confidence by 7.97%. *Id.* at 1101. Thus it found empirical evidence of "a resounding endorsement of the exclusionary rule on the basis that it promotes judicial integrity. The exclusionary rule is effective in promoting judicial integrity, and it should be applied more broadly, not more narrowly." *Id.* at 114. Thus this underpinning of *Carter*'s reasoning continues to hold purchase—and a good faith exception only undermines these foundational values.

*Carter* also correctly linked the exclusionary rule to Article I, Section 18's guarantee that "every person for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of law." This open courts provision traces to the Magna Carta—to King John's pledge to his barons that, "To no one will we sell, to no one will we deny or delay right or justice." John V. Orth & Paul Martin Newby, *The North Carolina State Constitution* 65 (2d ed. 2013).

The right to a remedy is central to that design. As Sir Edmund Coke explained in the seventeenth century, open courts mean little if they do not redress wrongs. The word "injury" in Section 18, drawn from the common-law concept of *injuria*, includes the violation of legal rights—constitutional rights among them. *See Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 376 N.C. 558, 607 (2021).

The violation of Section 20 through an unlawful search constitutes a legal injury that demands redress. As *Carter* recognized, alternative remedies like civil suits against officers are ineffective in practice: "In the period of history between

*Weeks* and *Mapp*, when the states were free to experiment with effective alternative remedial devices, none were developed. The *Mapp* Court was forced to conclude that 'other remedies have proved worthless and futile.'" *Carter*, 322 N.C. at 721 (quoting *Mapp v. Ohio*, 367 U.S. 643, 652 (1961)).

*Carter* catalogued the practical obstacles to civil remedies: "[T]he disinclination of juries to doubt the testimony of police witnesses about conduct undertaken to protect the public, the doctrine of sovereign immunity, the judgment-proof character of the working police officer, and the difficulty that the aggrieved plaintiff may encounter in finding and paying counsel to represent him in a damage action." *Carter*, 322 N.C. at 721.

Finally, *Carter* understood that deterrence operates institutionally, not merely individually. As the Court explained: "One of the great purposes of the exclusionary rule is to impose the template of the constitution on police training and practices." *Id.* The rule "is responsible for the systematic, in-depth training of police forces in the law of search and seizure." *Id.*

This Court concluded that "the exclusionary rule has been a potent force for achieving its intended deterrent purpose. Warrants today are more carefully prepared and scrutinized before issuance." *Id.* This systemic effect serves the constitutional purpose of constraining governmental power through institutional incentives for compliance.

A good faith exception undermines this systemic deterrence. If officers know

that seeking judicial authorization—even with weak probable cause—insulates them from exclusion, the incentive shifts. Rather than carefully building probable cause to ensure constitutional compliance, officers can present marginal cases to magistrates, confident that their "good faith reliance" protects them from constitutional accountability.

This creates perverse incentives: Why meticulously document probable cause when thin affidavits + magistrate approval + good faith exception = admissible evidence? Why invest in thorough investigation when shortcuts produce the same result? Why train officers in constitutional nuances when "good faith" is enough?

The exception *Carter* declined, yet the majority now embraces, does not just fail to deter—it actively encourages constitutional shortcuts. This is not speculation— it is predictable human behavior responding to changed costs and benefits.

So notwithstanding the majority's rewriting of our opinion in *Carter*, that case did explain why Section 20 of North Carolina's Constitution demands exclusion of evidence gathered by violating its terms, and why those principles counsel against a good faith exception. And it did not stand alone: The majority now claims that *Colson*, *Reams*, *Small*, and *Arrington* only "implied" a state constitutional exclusionary rule without ever holding one exists. But this fundamentally mischaracterizes that precedent. In *State v. Colson*, 274 N.C. 295, 305–06 (1968), this Court held that "evidence obtained by unreasonable search and seizure is inadmissible," citing both the Fourth Amendment and Article I, Section 15 (now Section 20) of the North

Carolina Constitution. The Court explained that after *Mapp*, "the States are no longer free to adopt or reject at will the exclusionary rule as a means of enforcing the Fourth Amendment in state courts." *Id.* at 306. Significantly, the Court also noted that "the federal exclusionary rule enunciated in *Weeks* became statutory law in North Carolina long before *Mapp* by enactment"—referring to North Carolina's 1937 statutory exclusion, adopted 24 years before federal mandate.

In *State v. Reams*, 277 N.C. 391, 395 (1970), this Court reiterated that "[e]vidence obtained by unreasonable search and seizure is inadmissible," citing the Fourth and Fifth Amendments, Article I, Section 15, N.C.G.S. § 15-27, and *Mapp*. We further reiterated that position in *State v. Small*, 293 N.C. 646, 656 (1977).[1] This is not doctrinal "implication by string citation"—this is application of established doctrine. From 1968 to 1984, this Court consistently cited both federal and state constitutions as requiring exclusion, applied exclusionary principles without questioning their existence, and analyzed only whether violations occurred and evidence needed to be suppressed.

This is the doctrinal landscape *Carter* inherited in 1988: decades of cases treating state constitutional exclusion as established, with the new question being whether North Carolina would follow the federal good faith exception that *United States v. Leon*, 468 U.S. 897 (1984) had just created four years earlier. *Carter*

---

[1] In *State v. Arrington*, 311 N.C. 633 (1984), the Court was not presented with the issue of whether to apply North Carolina's exclusionary rule, because it expressly held that "there was a substantial basis for the finding of probable cause" in that case. *Id.* at 643.

answered: No.

Now the majority takes this opportunity to expressly overrule *Carter* and those cases that followed it. The majority's willingness to discard thirty-seven years of settled precedent undermines legal stability and predictability. *State v. Garner*, 331 N.C. 491, 505–06 (1992) (applying *Carter*'s exclusionary rule); *State v. Scott*, 343 N.C. 313, 327 (1996) (same); *State v. Romano*, 369 N.C. 678, 685 (2017) (same); *Matter of Freeman*, 109 N.C. App. 100, 105 n.2 (1993) (same); *State v. Smith*, 124 N.C. App. 565, 578 (1996); *State v. Daye*, No. COA16-1119, 2017 WL 1650135, at *4 (N.C. Ct. App. May 2, 2017) (unpublished) (same). *Carter* has been the foundation for countless judicial decisions, prosecutorial choices, and police training programs. Overruling it creates uncertainty about the scope of constitutional protections and signals that constitutional rights are subject to the shifting political winds of judicial appointments.

The majority offers weak justification for this dramatic departure from precedent. *Carter* was not clearly erroneous—it reflected a careful analysis of constitutional text, history, and policy considerations. The decision has proven workable in practice and has created the systemic benefits it predicted: better police training, more carefully scrutinized warrants, and improved constitutional compliance. The majority now does little more than "change the time-honored meaning of various portions of our constitution by interpreting the text with the singular aim of reaching a desired outcome." *Harper,* 384 N.C. at 379.

## II.    The Majority's "Assum[ing] Without Deciding" a Constitutional Exclusionary Rule Is Incoherent and Procedurally Unprecedented

As this detour through the fundamental principles underlying *Carter* and the exclusionary rule shows, it is analytically essential to understand the purpose and scope of a constitutional rule in order to know what exceptions might logically apply to that rule. The majority purports to "assume without deciding that an exclusionary rule arises from Article I, Section 20," but then announces that any such rule is subject to "good faith exception" akin to that under federal law. This approach is logically impossible. One cannot rationally craft exceptions to a rule whose existence, scope, and purposes remain undefined. The exception is wholly derivative of the primary rule—it makes no sense to "assume" the rule while definitively declaring its limitations.

The federal good faith exception exists because the Supreme Court held the federal exclusionary rule is merely "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *Leon*, 468 U.S. at 906. When an officer acts in good faith, "there is no police illegality and thus nothing to deter." *Id.* at 921. But this reasoning only works if deterrence is the rule's sole purpose. If the exclusionary rule also serves judicial integrity—if courts have an independent constitutional obligation not to profit from constitutional violations—then the officer's good faith is irrelevant. The court still becomes complicit by admitting the evidence. If the rule embodies a constitutional right to remedy under Article I, Section 18—if every violation must have consequences—then the officer's

subjective mental state cannot eliminate that constitutional injury. Thus *Carter*'s framework for our state's exclusionary rule explains why a good faith exception is unsupported in our constitutional scheme.

Thus the majority has it backwards. One must first understand what the rule is and why it exists before determining when exceptions are appropriate. The majority's approach is like a doctor prescribing medication before diagnosing the disease, or an architect adding windows to a building without first confirming it has walls.

The majority's approach is also unprecedented in American jurisprudence. When the Supreme Court created the federal good faith exception in *Leon*, it first definitively confirmed that the exclusionary rule was a prudential, judicially created remedy, not constitutionally mandated. 468 U.S. at 905–06 ("We have frequently questioned whether the exclusionary rule can have any deterrent effect when the offending officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment."). Only after establishing this foundation for why the rule exists in the first place did the Court consider any exceptions based on deterrence rationales.

The majority's "assume without deciding but create exceptions anyway" approach is sui generis—and for good reason. It produces maximal judicial discretion with minimum accountability. Future cases can either rely on today's "assumption" or reject it, depending on which outcome proves more convenient. Meanwhile, the

majority has already limited whatever rule might exist through exceptions it adopted without ever defining the rule's contours.

The majority correctly recognizes that "the General Assembly may not dictate this Court's interpretation of the state constitution." (citing *Bayard v. Singleton*, 1 N.C. (Mart.) 5, 6–7 (1787)). But just as the legislature cannot create exceptions to constitutional rules, neither can this Court create exceptions to a constitutional rule it refuses to even acknowledge exists.

*Bayard* established that "no act th[e General Assembly] could pass[ ] could by any means repeal or alter the constitution." 1 N.C. at 6–7. The same logic applies to judicial erosion. If this Court can "assume" constitutional rules exist while immediately limiting them through exceptions—all while reserving the right to later declare the rules never existed—we have created a mechanism for constitutional amendment by judicial fiat.

This violates the fundamental principle that courts lack power to revise the constitution. As Alexander Hamilton explained in Federalist 78, the judiciary "will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them." *The Federalist No. 78*, at 464 (Alexander Hamilton) (Clint Rossiter ed., 1961). While the executive "holds the sword of the community" and the legislature "commands the purse," the judiciary "has no influence over either the sword or the purse" and "can take no active resolution whatever." *Id.* Hamilton emphasized that courts possess "neither force nor will, but

merely judgment." *Id.*

The majority's approach exceeds this limited judicial power. By "assuming without deciding" that a constitutional right exists while immediately crafting exceptions to it—thereby weakening the right without definitively acknowledging its existence—the majority exercises will rather than judgment. It reshapes constitutional protections to achieve a preferred policy outcome (admitting unconstitutionally obtained evidence) while avoiding accountability for honestly declaring what the constitution requires.

True judicial judgment would require the Court to:

1.  Examine Article I, Section 20's text, history, and purposes;

2.  Decide the scope of North Carolina's exclusionary rule;

3.  Determine whether that rule's constitutional foundations permit exceptions; and

4.  Apply that holding to the facts before us

Instead, the majority substitutes its will for judgment by:

1.  Refusing to examine whether the rule exists;

2.  "Assuming" it does (or might), thereby failing to establish the rule's purpose or foundations;

3.  Immediately adopting exceptions; and

4.  Reserving the right to later declare the rule never existed

This is precisely the type of judicial overreach Hamilton warned against—courts

using indirection and procedural gymnastics to achieve outcomes they lack authority to mandate directly. If this Court believes Article I, Section 20 contains no exclusionary rule, it should say so honestly. If it believes such a rule exists but permits exceptions, it should conduct proper constitutional analysis before crafting those exceptions. What it cannot do—consistent with its limited role as a court of judgment rather than will—is reshape constitutional protections through the backdoor of "assuming without deciding."

The majority's approach is particularly pernicious because it operates through indirection. Rather than honestly confronting whether Article I, Section 20 contains an exclusionary rule, the majority achieves the practical elimination of constitutional protection while claiming to exercise restraint. This is not judgment—it is will. It is not interpretation—it is amendment. And it is not restraint—it is the exercise of power courts do not possess.

As Hamilton warned, when courts exceed their proper role and substitute will for judgment, they threaten "the political rights of the Constitution" they are sworn to uphold. *The Federalist No. 78*, at 464 (Alexander Hamilton). This is a separation of powers violation dressed up as minimalism.

Moreover, the majority purports not to decide whether an exclusionary rule exists. But by adopting a good faith exception, the majority is deciding that Article I, Section 20's protections for individuals are weaker and more limited than under *Carter*. That is a decision about the scope and content of the constitutional rule.

In any event, the majority cannot disclaim responsibility for the consequences of its holding by hiding behind what it ostensibly did not decide. Whether achieved directly or indirectly, the practical result is identical: evidence obtained through constitutional violations will be admissible under the Court's decision today. The majority has made a constitutional decision while pretending it has not.

### III.    Conclusion

The majority abandons decades of precedent that have served this state well. Its decision to expressly overrule *Carter* is deeply misguided and a betrayal of *Carter*'s fundamental principles: judicial integrity, deterrence from police misconduct, and ensuring that every right has a remedy. By adopting a good faith exception, it hollows out the exclusionary rule that *Carter* so steadily protected. That is a decision about the constitutional rule—achieved through indirection rather than honest analysis. As James Madison warned in Federalist 62, when constitutional protections yield to governmental convenience, we create "a state of things in which it may be said with some truth that laws are made for the few, not for the many." *The Federalist No. 62*, at 379 (James Madison). The majority's decision thus comes at the expense of constitutional liberty and confidence in our rule of law. I would affirm the Court of Appeals' decision and reaffirm that *State v. Carter* remains the law of North Carolina. I respectfully dissent.

Justice RIGGS joins in this dissenting opinion.